**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**August 15, 2003**

**Charles R. Fulbruge III**
**Clerk**

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 02-60069

---

PUBLIC CITIZEN, INC.; SIERRA CLUB; GALVESTON-HOUSTON ASSOCIATION
FOR SMOG PREVENTION; HILTON KELLY,

Petitioners,

versus

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; RICHARD E. GREENE,
ADMINISTRATOR UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
REGION 6; CHRISTINE T. WHITMAN, ADMINISTRATOR, UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY,

Respondents.

---

Petitions for Review of an Order of the
Environmental Protection Agency

---

Before GARWOOD, SMITH, and BARKSDALE, Circuit Judges.

RHESA H. BARKSDALE, Circuit Judge:

Primarily at issue is whether, pursuant to Title V of the Clean Air Act, 42 U.S.C. §§ 7661-7661f, the Environmental Protection Agency (EPA) had authority to grant full approval to Texas' operating permit program, notwithstanding program deficiencies; and if so, whether it nonetheless was required by that Act to issue notices of deficiency for the claimed shortcomings. The petitions for review are **DENIED**.

I.

A.

The Clean Air Act (CAA), 42 U.S.C. §§ 7401–7671q, enacted in 1970 and extensively amended in 1977 and 1990, is a complex regulatory regime intended "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population". 42 U.S.C. § 7401(b)(1). "Primary responsibility" for enforcement of the CAA is vested in state and local governments; but, the CAA also provides for "Federal financial assistance and leadership ... for the development of cooperative Federal, State, regional, and local programs to prevent and control air pollution". 42 U.S.C. § 7401(a)(3), (4). States satisfy their responsibility by developing state implementation plans that specify emissions limitations and other measures to attain and maintain national ambient air quality standards. 42 U.S.C. § 7410(a)(2)(A)-(M).

In 1990, Congress enacted Title V for the CAA. Title V requires major stationary sources of air pollution, such as factories, to receive operating permits incorporating CAA requirements and establishes a procedure for federal authorization of state-run Title V permit programs. *See* 42 U.S.C. §§ 7661–7661f. Title V permits do not impose additional requirements on sources but, to facilitate compliance, consolidate all applicable requirements in a single document. *See* 42 U.S.C. § 7661a(a); *see*

2

*also* **Virginia v. Browner**, 80 F.3d 869, 873 (4th Cir. 1996) (Title V permit "is a source-specific bible for [CAA] compliance"), *cert. denied*, 519 U.S. 1090 (1997).

Congress directed the EPA to promulgate regulations establishing the minimum elements for a Title V operating permit program. Those minimum elements were to include certain requirements identified in the CAA. *See* 42 U.S.C. § 7661a(b) (articulating ten minimum elements for state programs).

The CAA required each State to develop, and submit to the EPA for approval, an operating permit program that met the requirements of the Act and its regulations (Part 70 — pursuant to the regulations implemented for the CAA). 42 U.S.C. § 7661a(d)(1). Section 502(d)(1) of the CAA, 42 U.S.C. § 7661a(d)(1), authorized the EPA to grant full approval to permit programs "to the extent" that the program met the CAA's requirements.

In the event a State was not eligible for full approval, but "substantially" met the minimum requirements, the CAA authorized the EPA to grant "interim approval". 42 U.S.C. § 7661a(g). On granting interim approval, the EPA had to identify deficiencies to be addressed before the program could receive full approval; the State was then required to revise and resubmit the program. *Id*. Interim approval could only last for two years and could not be renewed. *Id*.

Congress established firm deadlines for these processes. *See* 42 U.S.C. § 7661a. Pursuant to the statutory schedule: by November 1993, States were to submit proposed permit programs; by November 1994, the EPA had to either grant full or interim approval, or deny approval; by November 1995, the EPA was to take over state permit programs that did not meet federal requirements and had not been granted interim approval; and by November 1996, the EPA was to take over state permit programs that had been granted interim approval but did not qualify for full approval. In other words, compliant programs were to be operating no later than November 1996, six years after Title V became law. *See* 46 U.S.C. § 7661a(b), (d)(1), (d)(3), and (g).

If a program was not fully approved before the deadline, or if interim approval expired without the EPA's having granted full approval, the CAA mandated stiff sanctions, including exposure to financial penalties (*e.g.*, loss of highway funds). *See* 42 U.S.C. § 7661a(d)(2)(B) (incorporating 42 U.S.C. 7509(b)). Moreover, the EPA would be required to implement a federal Title V permitting program in that State, pursuant to EPA regulations. *See* 42 U.S.C. § 7661a(d)(3).

After the EPA approved a State's Title V permit program, the EPA was to maintain an oversight role. The CAA provides that, whenever the EPA makes a determination that a State is not adequately administering and enforcing its permit program in

4

accordance with Title V, it shall provide a notice of deficiency (NOD) to the State.  42 U.S.C. § 7661a(i)(1).  If the State does not correct the deficiency within 18 months, it faces sanctions and, eventually, EPA takeover of its program.  42 U.S.C. § 7661a(i)(2), (4).

B.

The EPA issued regulations providing minimum requirements for state permit programs and, pursuant to those rules, began reviewing and authorizing state permit programs.  It issued numerous interim approvals.  Despite the statutory language that interim approval was to last only two years and could not be renewed, the EPA also extended those approvals for an additional ten months as the November 1996 deadline approached.  *See* Operating Permits Program Interim Approval Extensions, 61 Fed. Reg. 56368 (31 Oct. 1996).  It subsequently extended interim approval three times.  *See* Extension of Operating Permits Program Interim Approvals, 62 Fed. Reg. 45732 (29 Aug. 1997); Extension of Operating Permits Program Interim Approval Expiration Dates, 63 Fed. Reg. 40054 (27 July 1998); Extending Operating Permits Program Interim Approval Expiration Dates, 65 Fed. Reg. 7290 (14 Feb. 2000).

The EPA was sued for doing so.  ***Sierra Club v. EPA***, No. 00-1262 (D.C. Cir. 2000).  As part of the settlement of that action, the EPA agreed:  (1) to implement a federal permit program by 1 December 2001 in any State that did not have full approval; and (2)

5

to take and respond by 1 December 2001 to public comments regarding deficiencies in state permit programs. *Id*. (Settlement Agreement). Regarding such public comments, it committed to respond on the merits to any claims of deficiency raised during the comment period and either issue an NOD or explain why it did not do so.

C.

In 1993, Texas submitted its Title V program to the EPA for approval. *See* Clean Air Act Final Interim Approval of Operating Permits Program; the State of Texas, 61 Fed. Reg. 32693 (25 June 1996). In 1996, the EPA granted interim approval to Texas' program. *See id*. The EPA identified numerous deficiencies in its approval notice that Texas was required to correct before it could obtain full approval. *See id*. at 32694-98; Clean Air Act Proposed Interim Approval for the State of Texas, 60 Fed. Reg. 30037 (7 June 1995). Subsequently, Texas submitted program revisions for the EPA's review.

Pursuant to the *Sierra Club* Settlement Agreement, the EPA published a Federal Register notice inviting public comments about Texas' program; Petitioners submitted comments in which they objected to full approval, based on their belief that Texas had not corrected all of the interim deficiencies and that additional deficiencies existed that had not been identified previously. The EPA determined, however, that Texas' revisions satisfactorily addressed the program deficiencies *identified during interim*

6

*approval*, Clean Air Act Proposed Full Approval for Texas, 66 Fed. Reg. 51895 (11 Oct. 2001); accordingly, it granted Texas full approval in December 2001, Clean Air Act Full Approval of Texas Permits Program, 66 Fed. Reg. 63318 (6 Dec. 2001).

Regarding the deficiencies *not identified by the time of interim approval*, the EPA concluded that newly identified deficiencies did not prohibit full approval. It stated it would respond to those alleged deficiencies in a separate, then concurrently pending administrative proceeding. *Id*. at 63329-30. In January 2002, based upon the EPA's review of the public comments, it issued an NOD that identified six deficiencies. Notice of Deficiency for Clean Air Act Operating Permits Program; State of Texas, 67 Fed. Reg. 732 (7 Jan. 2002).

In February 2002, the EPA issued a response letter explaining its rationale for not issuing NODs for other deficiencies claimed by Petitioners. *See* Operating Permits Program; Notice of Location of Response Letters to Citizens Concerning Program Deficiencies in Texas, 67 Fed. Reg. 16374 (5 Apr. 2002). The response explained that the EPA agreed with Petitioners concerning some of the issues and was working with Texas to ensure its program was being implemented consistent with Title V; on other issues, it did not agree with Petitioners. EPA Responses to Citizen Comments on State Program Deficiencies (Texas) (21 Feb. 2002), *at*, http://www.epa.gov/air/oaqps/permits/response/.

Petitioners seek review of two EPA final actions related to Texas' Title V operating permits program:  (1) the 6 December 2001 full approval of the program; and (2) the 21 February 2002 decision not to issue NODs related to four aspects of the program.  Texas has intervened in favor of the EPA, as have BP America, Inc., *et al*. (Industry Intervenors).

Where Congress has delegated authority to an agency to make rules carrying the force of law and the agency's interpretation of its governing statute was promulgated in the exercise of that authority, we apply the familiar two-step inquiry established by *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 942-43 (1984). *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001).  Under *Chevron*, we will not defer to an agency's interpretation that contravenes Congress' unambiguously expressed intent. *Chevron*, 467 U.S. at 942-43.  On the other hand, we must defer to a reasonable agency interpretation when the question is one to which the statute does not speak directly. *See id*.

Otherwise, our review of agency action is governed by the familiar deferential standard established by the Administrative Procedure Act, 5 U.S.C. §§ 701-706 (APA):  we must set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law".  5 U.S.C. § 706(2)(A).  Under this standard, we must assure ourselves that the

8

agency considered the relevant factors in making the decision, its action bears a rational relationship to the statute's purposes, and there is substantial evidence in the record to support it; but, we cannot substitute our judgment for that of the agency. *Texas Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 934 (5th Cir. 1998). We will uphold an agency's actions if its reasons and policy choices satisfy minimum standards of rationality. *Id*. at 934. Moreover, the EPA's interpretations of its regulations are entitled to substantial deference and are given "controlling weight" unless "plainly erroneous or inconsistent with the regulation". *Thomas Jefferson Univ. v. Shahala*, 512 U.S. 504, 512 (1994).

## A.

Petitioners first maintain the EPA, in December 2001, had no authority to grant Texas' permit program full approval without finding that the program met the requirements of Title V and its implementing regulations. They further maintain that the EPA acted arbitrarily and capriciously in granting full approval because Texas had not corrected all deficiencies identified at interim approval.

## 1.

The first issue is a question of statutory interpretation governed by the *Chevron* standard. Under the EPA's interpretation of the statutory provisions governing interim and full approval, CAA § 502g, 42 U.S.C. § 7661a(g) (governing interim approval),

9

provides an alternate path to full approval. Full approval would otherwise be governed by CAA § 502(d), 42 U.S.C. § 7661a(d), and would not be permitted when the EPA determined (as it did) that the program did not meet all of Title V's requirements. According to the EPA, if a State is granted interim approval, then to receive full approval it need only remedy deficiencies identified by the EPA *at the time of interim approval*.

Petitioners dispute this interpretation, contending that, when the EPA is aware of deficiencies, it may not fully approve a program (regardless of whether it becomes aware of the deficiencies *before or after* interim approval). According to Petitioners: there is but one path to full approval, that provided by CAA § 502d, 42 U.S.C. § 7661a(d); and only deficiency-free programs may be approved. Petitioners urge that the EPA's interpretation is contrary to the clear and unambiguous intent of Congress; and, in the alternative, that the approval was arbitrary and capricious because it contradicts EPA regulations and memoranda.

a.

CAA § 502(d), 42 U.S.C. § 7661a(d)(1), relied upon by Petitioners, provides:

> Not later than 3 years after November 15, 1990, the Governor of each State shall develop and submit to the Administrator a permit program under State or local law or under an interstate compact meeting the requirements of this subchapter ... Not later than 1 year after receiving a program, and after notice and opportunity for public comment, the

10

Administrator shall approve or disapprove such program, in whole or in part. The Administrator may approve a program to the extent that the program meets the requirements of this chapter, including the regulations issued under subsection (b) of this section. If the program is disapproved, in whole or part, the Administrator shall notify the Governor of any revisions or modifications necessary to obtain approval. The Governor shall revise and resubmit the program for review under this section within 180 days after receiving notification.

CAA § 502(g), 42 U.S.C. § 7661a(g), which governs interim approval, provides in part:

If a program (including a partial permit program) submitted under this subchapter substantially meets the requirements of this subchapter but is not fully approvable, the Administrator may by rule grant the program interim approval. In the notice of final rulemaking, the Administrator shall specify the changes that must be made before the program can receive full approval.

We agree with the Second Circuit that ambiguity exists in these provisions. *See* **New York Pub. Interest Research Group v. Whitman**, 321 F.3d 316, 328 (2nd Cir. 2003).

It arises because the text of § 502(g), governing interim approval, does not clearly describe the process by which a permit program that has received interim approval receives full approval. After making the changes specified at the time of interim approval, must the state resubmit its plan for evaluation under the standards set forth in § 502(d), which would require the EPA to examine the program's compliance with Title V? Or

11

> does a state's program automatically qualify
> for full approval when the state makes "*the
> changes*" specified at the time of interim
> approval?

*Id.* (emphasis added).

On fully approving Texas' program, the EPA acknowledged this ambiguity, finding an "apparent tension" between the requirement that it grant full approval only to programs that meet minimum requirements and the requirement that it grant full approval to any program that has corrected interim deficiencies. 66 Fed. Reg. at 63319 ("Standing alone, § 502(d) appears to prevent EPA from granting a state operating permit program full approval until the state has corrected all deficiencies in its program no matter how insignificant, and *without consideration as to when* such deficiency was identified. Alternatively, § 502(g) appears to require that EPA grant a state program full approval if the state has corrected those issues that the EPA identified in the final [interim approval]." (emphasis added)).

Therefore, the EPA had to decide "whether Texas by virtue of correcting the deficiencies identified in the [interim approval was] eligible ... for full approval, or whether Texas *must also* correct any new or recently identified deficiencies as a prerequisite to receiving full approval". *Id.* at 63319-20 (emphasis added). The EPA concluded:

> [T]he appropriate and more cohesive reading of
> the statute recognizes the EPA's authority to
> grant Texas full approval [where interim-

12

> approval deficiencies have been corrected]
> while working simultaneously with the state,
> in [the EPA's] oversight capacity, on any
> additional problems that were recently
> identified. To conclude otherwise would
> disrupt the current administration of the
> state program and cause further delay in
> Texas's ability to issue operating permits to
> major stationary sources.

*Id*. at 63320.

Because Congress did not unambiguously express its intent on this issue through the CAA, the EPA's interpretation is entitled to deference under *Chevron*. As a result, we must decide whether the EPA's interpretation is "based on a permissible construction of the [CAA]". *Chevron*, 467 U.S. at 843.

We hold that it is. First, CAA § 502(g), 42 U.S.C. § 7661a(g), provides that, in the notice of final rulemaking granting interim approval, the EPA must "specify *the* changes that must be made before the program can receive full approval". (Emphasis added.) This suggests the interim-approval notice must identify all of the changes required for full approval, and the making of those specified changes (not all possible changes) triggers full approval.

Second, as the Second Circuit noted:

> [T]he EPA's interpretation comports with the
> timetable established by Congress, if not
> adhered to by the EPA. Under § 502(g),
> interim approval expires after two years and
> is not renewable. 42 U.S.C. § 7661a(g).
> Changes identified at the time of interim
> approval may require modifications of state
> statutes or regulations and, therefore, may be

13

time consuming. *If a state were required, not only to make the changes identified at the start of interim approval but also to correct deficiencies arising during interim approval*, a state's efforts to receive full approval could be sabotaged by the identification of new deficiencies during or at the end of interim approval. Should these events occur it is doubtful whether the state could resubmit its plan for full approval since § 502(d) provides that any such submission must occur "[n]ot later than three years after November 15, 1990," 42 U.S.C. § 7661a(d)(1), and the statute does not otherwise authorize re-submission.

*New York Pub. Interest Research Group*, 321 F.3d at 329 (emphasis added).

Finally, the CAA provides a mechanism for correcting deficiencies in fully-approved programs — the NOD process (discussed in detail *infra*). Like the Second Circuit, "[w]e question whether Congress would have armed the EPA with this arsenal if it believed that every deficiency would be corrected during the interim approval period". *Id*. at 329. Moreover, the NOD process also applies to programs that have been granted interim approval, providing a means to correct deficiencies not identified at the time of interim approval. Thus, Congress provided processes for making corrections to programs once they initially enter the approval process and are given at least interim approval.

b.

Petitioners maintain that, even if the EPA's interpretation is not contrary to law, its full approval of Texas' program was

14

arbitrary and capricious because: two EPA memoranda support Petitioners' view of the CAA; and the EPA's interpretation is contrary to EPA regulations.

Regarding the memoranda, Petitioners have not shown that the views reflected in those two isolated memoranda are the official policy of the EPA. These memoranda simply are not binding on the EPA.

Regarding the EPA regulations that allegedly conflict with the EPA interpretation, 40 C.F.R. § 70.10(a) states:

> (1) ... [I]f an interim approval expires and the Administrator has not approved a whole part 70 program:
>
> > (i) At any time the Administrator may apply any one of the sanctions specified in section 179(b) of the Act; and
> >
> > (ii) Eighteen months after the date required for submittal or the date of disapproval by the Administrator [sanctions will apply].
>
> (2) If full approval of a whole part 70 program has not taken place within 2 years after the date required for such submission, the Administrator will [take over the program].

The regulations define "whole program" as "a part 70 permit program, or any combination of partial programs, that meet all the requirements of these regulations and cover all the part 70 sources in the entire State". 40 C.F.R. § 70.2.

Petitioners maintain: these regulations suggest that the EPA believes a program must meet all requirements for full approval;

15

they constitute EPA's definitive interpretation of the CAA; and they may be changed only through a formal modification of the EPA's rules. The EPA responds that this regulatory section addresses the consequences that follow from expiration of interim approval in the absence of a fully approved Title V program. The EPA points out that 40 C.F.R. § 70.10 does not address the criteria for approving State programs and, in particular, whether § 502(g) authorizes the EPA to grant full approval to a State that corrects the deficiencies identified at the time of interim approval. It concludes: § 70.10 has no applicability here because interim approval of the Texas program did not "expire" — full approval superceded interim approval; and, for this situation, the relevant regulation is 40 C.F.R. § 70.4(f)(2), which addresses requiring States with interim approval to submit changes before expiration of interim approval.

Again, we must give substantial deference to the EPA's interpretation of its regulations. Here, the EPA's position that these regulations are not inconsistent with its interpretation of the CAA is not "plainly erroneous" and is thus entitled to "controlling weight". *Thomas Jefferson Univ*., 512 U.S. at 512. In short, the EPA's interpretation of the CAA is reasonable, and the EPA's acting pursuant to that interpretation was neither arbitrary nor capricious.

16

Petitioners nonetheless contend that the EPA acted arbitrarily and capriciously in granting full approval to Texas because it had not corrected three of the deficiencies identified at interim approval. The EPA responds that it evaluated Texas' response to each deficiency and concluded that Texas had satisfactorily addressed the EPA's concerns.

We note that the EPA's determinations were based on detailed, technical evaluations of revisions to the Texas program to determine whether that program complied with the CAA and the EPA's regulatory scheme. Again, the EPA is entitled to a substantial deference in interpreting its regulations. *E.g.,* **Marine Shale Processors v. EPA**, 81 F.3d 1371, 1384 (5th Cir. 1996), *cert. denied*, 519 U.S. 1055 (1997).

a.

The new source review (NSR) component of the CAA addresses preconstruction review for new and modified stationary sources of air pollution. All States must administer an EPA-approved program, commonly referred to as "minor NSR", that requires new sources and existing sources subject to modification to obtain a preconstruction authorization containing appropriate emission limitations and standards. *See* 60 Fed. Reg. at 30039 (citing 40 C.F.R. § 70.2). Minor NSR permit terms and conditions are

applicable requirements of the Act that must be incorporated into a Title V permit. *See* *id.*

During the interim approval process, the EPA identified as a deficiency Texas' failure to recognize the terms and conditions of minor NSR permits as applicable requirements. *See* *id.* It stated that, prior to full approval, Texas had to identify minor NSR as an applicable requirement and revise its regulations to be consistent with the federal regulations (Part 70). *Id.* Additionally, it stated that Texas had to, upon or before the granting of full approval, institute proceedings to reopen Title V permits issued under interim approval to incorporate any excluded minor NSR permits. *Id.*

Texas subsequently took a series of actions to correct the deficiency, which the EPA determined met the minimum requirements, 66 Fed. Reg. at 51897-98: it amended its definition of applicable requirements to include minor NSR, *id.* (citing 30 Tex. Admin. Code § 122.10(2)); and amended its rules to require new permit applicants to list minor NSR permits in their applications and to require that newly issued Title V permits incorporate minor NSR permits, *id.* (citing 30 Tex. Admin. Code § 122.132(e)(11) and 122.142(b)(3)). For previously issued Title V permits, and those for which the State had initiated public notice prior to the rule changes, it amended its rules to require that, before 1 December 2001, the State would institute proceedings to reopen existing

18

Title V permits to incorporate minor NSR permits no later than permit renewal (*i.e.*, no later than the end of the five-year term of the permit). *Id*. (citing Tex. Admin. Code § 122.231(c)). Pursuant to an agreement with the EPA, it committed to incorporate the permits on a faster schedule: for existing permits with two or more years remaining until renewal, within three to four years of initial issuance. *Id*. at 51897-98.

Petitioners contend Texas had not corrected its exclusion of minor NSR permits from its requirements for Title V permits. They assert: not all of Texas' permits (including previously-issued permits) incorporated minor NSR terms at the time of full approval; Texas' permits did not include minor NSR permit terms but merely cross-referenced minor NSR permits; and Texas' correction was flawed because it allowed incorporation of minor NSR into existing general operating permits.

i.

Petitioners insist that Texas' schedule was too slow and failed to assure sources' compliance with minor NSR terms and conditions upon full approval, in violation of Part 70. The EPA determined Texas corrected the deficiency based on its rule changes and its commitment to incorporate minor NSR permits into existing Title V permits on an expedited schedule.

The relevant section of Part 70 provides that a program with interim approval that excludes minor NSR as an applicable

19

requirement "must, upon or before granting of full approval, *institute* proceedings to reopen part 70 permits to incorporate excluded minor NSR permits as terms of the part 70 permits...." 40 C.F.R. § 70.4(d)(3)(ii)(D) (emphasis added). As the EPA determined, Texas met this requirement. This determination was neither arbitrary nor capricious.

### ii.

Petitioners next maintain Texas did not correct the deficiency, because Texas' permits do not include minor NSR permit terms — instead, they cross-reference the permit numbers of minor NSR permits. The EPA contends it reasonably found that minor NSR permits could be incorporated by reference (*i.e.*, the minor NSR permit number listed, together with a statement that the minor NSR terms are included as applicable requirements).

Nothing in the CAA or its regulations prohibits incorporation of applicable requirements by reference. The Title V and Part 70 provisions specify *what* Title V permits "shall include" but do not state *how* the items must be included. *See* 42 U.S.C. § 7661c(a) ("[e]ach permit issued under this subchapter shall include enforceable emissions limitations and standards ... and such other conditions as are necessary to assure compliance with applicable requirements of this chapter"); 40 C.F.R. § 70.6(a)(1) ("[e]ach permit issued under this part shall include [elements including emissions limitations and standards]").

20

The EPA concedes that, in providing guidance, it has stated that emissions limitations and standards should be restated on the face of the Title V permit and that incorporation by reference of the details should only occur after such a restatement. On the other hand, this guidance was not binding on the EPA and did not require it to determine Texas has not corrected its interim deficiencies. The EPA balanced the streamlining benefits of incorporation by reference against the value of a more detailed Title V permit and determined Texas' deficiency had been cured to its satisfaction. In so doing, it properly considered Petitioners' concerns, such as the potential impact of incorporation-by-reference on the ability of the public to be informed of the requirements in the Title V permit and to comment on them. *See* 66 Fed. Reg. at 63324 & n.4. Contrary to Petitioners' assertions, neither the CAA nor its implementing regulations require more; and the EPA determination was neither arbitrary nor capricious.

### iii.

Finally, Petitioners contend that Texas' changes are flawed because they allow incorporation of minor NSR into general operating permits (GOPs). GOPs are issued to cover numerous similar sources in lieu of a specific Title V permit. 42 U.S.C. § 7661c(d); 40 C.F.R. § 70.6(d). Petitioners contend GOPs may not incorporate minor NSR requirements because minor NSR requirements vary by site.

21

This issue was not presented to the EPA during the full approval process. Absent exceptional circumstances, a party cannot judicially challenge agency action on grounds not presented to the agency at the appropriate time during the administrative proceeding. *See Texas Oil & Gas Ass'n*, 161 F.3d at 933 n.7. (Also, Petitioners could have, but did not, challenge revisions to the GOPs themselves. *See* 42 U.S.C. § 7661c(d); 40 C.F.R. § 70.7(e)(4).) We conclude that this issue is not properly before us.

b.

Next, Petitioners point to Texas' Audit Privilege Act as an interim-approval-identified deficiency that had not been corrected. They maintain the Audit Privilege Act prevents Texas from having adequate authority to enforce its permit program.

Title V includes, as one of its minimum elements, the requirement that the State have adequate authority to assure that sources comply with all applicable requirements and to enforce permits. 42 U.S.C. § 7661a(b)(5); *see also* 40 C.F.R. § 70.11(c) (penalties must be "appropriate to the violation"). Texas, through its Audit Privilege Act, provides for certain immunities and privileges associated with information obtained through an environmental audit of a facility. TEX. REV. CIV. STAT. art. 4447cc.

In the EPA's interim approval notice for Texas, it noted its concern that the Audit Privilege Act might prevent Texas from

22

having adequate enforcement authority.  61 Fed. Reg. at 32697.  The EPA stated that, to qualify for full approval, Texas would be required to demonstrate that the Audit Privilege Act did not limit Texas' ability to adequately enforce and administer the operating permit program.  *Id.*

In response, Texas amended the Audit Privilege Act.  According to the EPA, these amendments:  (1) eliminated the application of immunity and privilege provisions to criminal actions; (2) eliminated the application of immunity where a violation results in a serious threat to health or the environment, or where the violator has obtained a substantial economic benefit that gives it a competitive advantage; (3) clarified that the law would not sanction individuals who report violations of environmental laws to government agencies; and (4) clarified that the privilege does not impair access to information required to be made available under federal or state law.  *See* 66 Fed. Reg. at 51903.

Petitioners concede that Texas has made these changes to its Audit Privilege Act since 1996, but insist that the law still: prevents Texas from having adequate enforcement authority; prevents it from being able to assess appropriate penalties; and improperly makes audit documents privileged.  The EPA responds that it reasonably determined that limited immunity does not, *per se*, preclude States from possessing adequate enforcement authority.

i.

23

Concerning the adequacy of Texas' enforcement authority, Petitioners insist the Audit Privilege Act prevents Texas from being able to recover civil penalties for each violation of the Act because it has granted certain immunities. On the other hand, the EPA determined the immunities provided by Texas' Audit Privilege Act did not deprive Texas of adequate enforcement authority. It reasoned the Act does not: limit Texas' ability to seek declaratory or injunctive relief for violations disclosed by an audit; affect Texas' ability to pursue criminal sanctions, if appropriate; or preclude actions seeking penalties for serious violations. This determination was not arbitrary and capricious.

ii.

Regarding the Audit Privilege Act's impact on Texas' ability to impose appropriate penalties, Title V and Part 70 require that Texas have authority to recover penalties of up to $10,000 per day in an amount "appropriate to the violation". 40 C.F.R. § 70.11; *see also* 42 U.S.C. § 7661a(b)(5)(E). The EPA has interpreted these provisions to require that state law allow for the consideration of the penalty factors identified in CAA § 113(e), 42 U.S.C. § 7413(e): the violator's compliance history; the economic benefit of noncompliance; and the seriousness of the violation.

Petitioners note minor semantic differences between the federal penalty factors and those allowed consideration under the Audit Privilege Act. For example, Texas must be able to penalize

24

violations resulting in substantial economic benefit; Texas' Audit Privilege Act provides an exception to immunity for violations that "have resulted in a significant economic benefit which gives the violator a clear advantage over its business competitors". TEX. REV. CIV. STAT. Art. 4447cc § 10(d)(5). Notwithstanding minor variations, the EPA reasonably determined that Texas' statutory language allowed it to consider the appropriate factors in imposing punishments.

iii.

Petitioners assert Texas' Audit Privilege Act impermissibly makes audit documents privileged. The EPA responds that Texas addressed this concern by adding a section to the Audit Privilege Act that restored the authority of the State's employees, "[n]otwithstanding the privilege established under this Act" to "review information that is required to be available under a specific state or federal law...." TEX. REV. CIV. STAT. art. 4477cc, § 9(b). The EPA determined this section restored Texas' authority to view any documents required to be collected, maintained, or reported under Title V, which it deemed sufficient to address the deficiency and for Texas to conduct both civil and criminal investigations. *See* 66 Fed. Reg. at 63329. This assessment was not arbitrary or capricious.

c.

25

Finally, Petitioners contend full approval was arbitrary and capricious because Texas has not demonstrated that it has adequate funding and personnel to administer a Title V program. 42 U.S.C. § 7661a(b)(4) requires States to so demonstrate, and Part 70 instructs that this demonstration must include a four-year estimate of program costs and a description of how the State plans to cover those costs. 40 C.F.R. § 70.4(b)(8)(v). The funding must be collected as a fee from owners and operators of Title V sources and must be sufficient to cover the cost of the Title V permit program, including: granting/denying permits; enforcing permits; emissions and ambient monitoring; preparing regulations and guidance; and modeling and tracking emissions. 42 U.S.C. § 7661a(b)(3)(A)(i)-(vi).

At the time of interim approval, the EPA identified as a deficiency Texas' failure to provide the four-year estimate. *See* 60 Fed. Reg. at 30044. Texas subsequently provided a four-year estimate of costs and its projection that fee revenues would exceed these costs. Texas estimated average annual costs of $34.3 million and revenues of $36.8 million for the four-year projection period.

Petitioners maintain that Texas has not corrected the deficiency because: this estimate includes an anticipated fee increase in 2003 (from $26 to $30 per ton) that the Texas agency staff stated it would recommend to the Commissioners of the Texas Natural Resources Conservation Commission; and, although costs of

the program will increase, Texas has not budgeted for additional staff.

## i.

Regarding the proposed increase, the EPA responds that it had no reason to believe an increase would not be adopted. Moreover, it notes that, if for some reason Texas did not adopt the recommended increases, it could then issue an NOD. This determination was not arbitrary or capricious.

## ii.

Regarding Petitioners' assertion that the Texas agency faces a significant amount of work in the next few years which will increase costs, the EPA notes that Texas provided a spreadsheet identifying permitting tasks, the number of permitting actions in each category, and the number of staff members required to complete the tasks. It questioned Texas concerning certain items and was satisfied with Texas' explanations. This was not arbitrary or capricious.

## 3.

In sum, because the EPA's interpretation of these CAA provisions is a reasonable, and thus permissible, interpretation of the statute and because the EPA's determination that Texas corrected interim deficiencies was not arbitrary and capricious, Petitioners fail in their challenge to the EPA's decision to fully approve Texas' program.

B.

In the alternative, Petitioners challenge the EPA's failure to issue an NOD to the Texas program for its failure to satisfy regulatory requirements regarding:  (1) public participation; (2) source monitoring and reporting; (3) enforcement authority; and (4) the timely issuance of permits.

As described *supra*:

> Whenever the Administrator makes a determination that a permitting authority is not adequately administering and enforcing a program, or portion thereof, in accordance with the requirements of this subchapter, the Administrator shall provide notice to the State....

42 U.S.C. § 7661a(i)(1).  Upon issuance of an NOD, sanctions may be imposed; and, if the State does not correct the deficiencies within 18 months, the EPA is required to take over and administer the program.  42 U.S.C. § 7661a(i)(4).

Petitioners contend that essentially the same deficiencies that should have prevented full approval obligated the EPA to issue an NOD.  (As noted, the EPA did issue an NOD for some, but not all, issues requested by Petitioners.)  The EPA asserts it has discretion under the CAA to determine whether Texas' commitment to address the EPA's concerns excused the need for a formal NOD. Petitioners insist that the EPA was not entitled to rely on an informal commitment by the State to address the deficiencies but

28

was required by the CAA to utilize the formal NOD procedure because it concluded Texas' program was deficient.

In other words, the parties dispute whether § 502(i) obligates the EPA to issue an NOD whenever it is made aware of deficiencies (even minor ones) in a State's permitting program or whether the EPA has discretion to determine whether to engage its formal enforcement mechanism.

Petitioners point out that the use of the word "shall" suggests the EPA has no discretion. On the other hand, this is preceded by, "[w]henever the Administrator makes a determination [that a program is not being adequately administered]" — language which clearly grants discretion. As the Second Circuit noted:

> Presumably, Congress could have fashioned a regime under which, for example, an interested party could initiate the process leading to a determination of whether "a permitting authority is adequately administering and enforcing a program." Congress, however, took a different path. Because the determination is to occur *whenever the EPA makes it*, the determination is necessarily discretionary.

*New York Pub. Interest Research Group*, 321 F.3d at 331 (emphasis added). *See also City of Seabrook v. Costle*, 659 F.2d 1371, 1374 (5th Cir. Unit A 1981) (statutory authority to make finding of violation creates discretionary duty to make findings when violation is alleged). While the CAA requires the EPA to issue an NOD when it has determined that a program is not being adequately administered or enforced, this "nondiscretionary obligation arises

29

*only after* a discretionary determination by the EPA". **New York Pub. Interest Research Group**, 321 F.3d at 331 (emphasis added).

Under the APA, an agency's decision not to invoke an enforcement mechanism provided by statute is not typically subject to judicial review. *See* 5 U.S.C. § 701(a)(2); **Heckler v. Chaney**, 470 U.S. 821, 832 (1985) ("[A]n agency's decision not to take enforcement action should be presumed immune from judicial review under § 701(a)(2)").

> The presumption against judicial review of such refusal avoids entangling courts in a calculus involving variables better appreciated by the agency charged with enforcing the statute and respects the deference often due to an agency's construction of its governing statutes....

**New York Pub. Interest Research Group**, 321 F.3d at 331; *see also* **Heckler**, 470 U.S. at 831-2 ("[A]n agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise.... [T]he agency is far better equipped than the courts to deal with many of the variables involved in the proper ordering of its priorities.").

The presumption against judicial review may be rebutted if the statute "circumscribes agency enforcement discretion, and has provided meaningful standards for defining the limits of that discretion", **Heckler**, 470 U.S. at 834-35. Such standards are not present in this portion of Title V. The only limitation on the EPA's power in this context, contained in CAA § 502(i), 42 U.S.C.

30

§ 7661a(i), is that it must issue an NOD when it determines a program is being inadequately administered.  Here, the EPA has concluded to the contrary, leaving us nothing to review.

The clear language of CAA § 502(i), 42 U.S.C. § 7661a(i), undisputably grants the EPA the authority to initiate the NOD process when it deems doing so appropriate.  In other words, Congress left the decision whether, and when, to issue an NOD "to the institutional actor best equipped to make it".  *New York Pub. Interest Research Group*, 321 F.3d at 332.  Accordingly, the EPA's decision not to issue an NOD for the four grounds raised by Petitioners is not subject to our review.

### III.

For the foregoing reasons, the petitions for review are

*DENIED*.