# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 15, 2012

No. 10-60459

Lyle W. Cayce
Clerk

BCCA APPEAL GROUP; STATE OF TEXAS; TEXAS ASSOCIATION OF MANUFACTURERS; TEXAS OIL & GAS ASSOCIATION,

PETITIONERS

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

RESPONDENT

Petitions for Review of an Order of the
Environmental Protection Agency

Before SMITH, SOUTHWICK, and GRAVES, Circuit Judges.

PER CURIAM:[*]

BCCA Appeal Group, the State of Texas, the Texas Association of Manufacturers, and the Texas Oil & Gas Association (collectively "BCCA") petition this Court for review of the Environmental Protection Agency's (EPA) final order disapproving a state implementation plan revision submitted by the State of Texas pursuant to the Clean Air Act.[1]  At issue is whether the EPA abused its discretion, acted arbitrarily and capriciously, and exceeded its

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] 42 U.S.C. §§ 7401-7671q.

No. 10-60459

statutory authority in denying the plan revision. We conclude that it did not and deny the petitions for review.

## FACTS AND PROCEDURAL HISTORY

This case involves state implementation plan (SIP) revisions to the Qualified Facilities Program (QFP) enacted by Texas in 1995 and submitted for EPA approval in 1996. The plan was resubmitted for EPA approval in 1998.[2] In 2008, industry groups (BCCA) filed suit against the EPA for failing to timely make a decision on approval of the plan under the eighteen-month time period set out in the Clean Air Act (CAA). *See* 42 U.S.C. §§ 7410(k)(1)(B), (k)(2). The lawsuit was prompted by EPA enforcement letters that facilities should comply with existing rules prior to the proposed revisions. BCCA asked the district court to order a schedule establishing deadlines by which the EPA would have to take action on pending Texas air permit revisions. The parties agreed to a settlement and a consent decree was entered on Jan. 21, 2010, obligating EPA to "approve or disapprove, in whole or in part," the relevant revisions within the time period established by the court. *See BCCA Appeal Group v. EPA*, No. 3:08-cv-01491-G (N.D. Tex. Jan. 21, 2010).

On April 14, 2010, EPA issued its final rule disapproving the program. 75 Fed. Reg. 19,468-93 (Apr. 14, 2010). EPA disapproved the program because it did not meet the Minor New Source Review (NSR) SIP nor did it meet the NSR SIP requirement for a substitute Major NSR SIP revision. Thereafter, BCCA Appeal Group, Texas Oil & Gas Association, and Texas Association of Manufacturers (collectively "BCCA"), and the State of Texas filed petitions for

---

[2] Texas has since submitted proposed revisions to the program under State law to address the reasons for the disapproval of the program. The EPA has not completed its review of this submission, which it says "fully re-writes the Qualified Facilities Program." Those rules are not before this court.

2

No. 10-60459

review of the final EPA action with this court, which has jurisdiction under 42 U.S.C. § 7607(b)(1).

## STANDARD OF REVIEW

In considering the EPA's interpretation of the CAA, a statute it administers, this Court applies the two-step analysis set forth in *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). If Congress has spoken directly on the question at issue, the "court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. However, if "Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute." *Id.* at 843. "Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843.

Otherwise, this Court reviews final action by the EPA on SIP revisions under the Administrative Procedure Act, which requires that this court shall: "hold unlawful and set aside agency action, findings, and conclusions found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. . . ." 5 U.S.C. § 706(2)(A). Under this standard, this court must be assured that the agency considered the relevant factors in making the decision, that the action bears a rational relationship to the purpose of the statute, and that there is substantial evidence in the record to support it. *Public Citizens, Inc. v. EPA*, 343 F. 3d 449, 455 (5th Cir. 2003). "[B]ut, we cannot substitute our judgment for that of the agency." *Id.* This court will uphold the agency's actions if the minimum standards of rationality are satisfied by its reasons and policy choices. *Id.* "Moreover, the EPA's interpretations of its regulations are entitled to substantial deference and are given 'controlling weight' unless 'plainly erroneous or inconsistent with the regulation.'" *Id.* at 455-

No. 10-60459

56 (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994).

## DISCUSSION

The petitioners assert that the EPA's disapproval of the QFP is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the law. In doing so, BCCA asserts that the EPA acted "more than a decade too late." With regard to this timeliness issue, there are provisions in the CAA setting out a time period of some eighteen months. 42 U.S.C. §§ 7410(k)(1)(B), (k)(2). However, the CAA also says: "The plan revision shall not be treated as meeting the requirements of this chapter until the Administrator approves the entire plan revision as complying with the applicable requirements of this chapter." 42 U.S.C. § 7410(k)(3). Further, the remedy for an Administrator's failure to perform an act or duty under this chapter is a civil action in district court to compel agency action. 42 U.S.C. § 7604(2).

BCCA filed such a suit and obtained a consent decree obligating the EPA to "approve or disapprove, in whole or in part," the relevant revisions within the time period established by the court. *See BCCA Appeal Group v. EPA*, No. 3:08-cv-01491-G (N.D. Tex. Jan. 21, 2010). BCCA admits in its complaint filed in that district court action that it did not file the suit, which was more than a decade after the revisions were submitted, until the EPA sent enforcement letters to facilities demanding that they operate under existing rules rather than the proposed revisions that had not yet been approved. *Id*. Nevertheless, BCCA properly pursued a civil action and obtained the appropriate relief through the consent decree, which also provided payment of attorneys' fees by the EPA.

With regard to the revisions, the EPA found that the program did not meet the Minor NSR[3] SIP requirements nor did it meet the Major NSR[4] SIP

---

[3] The CAA requires that Minor NSR programs provide for the enforcement and "regulation of the modification and construction of any stationary source within the areas

4

No. 10-60459

requirements for a substitute Major NSR SIP revision.  In other words, as stated in the EPA's brief:

> EPA disapproved the program because it determined, among other things, (i) that because the Program is not explicitly limited to smaller sources of pollutants as Texas claims, a major source may circumvent applicable requirements, (ii) that the Program allows facilities to make changes that potentially increase emissions of pollutants without ensuring that there will be no interference with clean air standards or control strategies, and (iii) that Texas did not provide EPA with sufficient information to demonstrate that the Program meets certain statutory and regulatory requirements necessary to approve the Program under 42 U.S.C. § 7410(*l*).

The petitioners assert that the EPA improperly or mistakenly injected requirements found in Major NSR provisions.  However, the EPA found that the program was not clearly limited to Minor NSR.  The petitioners conceded at oral argument that the plan does not explicitly state that it is limited to Minor NSR. Therefore, the issue of whether the program was clearly limited to Minor NSR is dispositive of many of the petitioners' assertions and they are not all discussed individually herein.

The proposed revisions at issue were enacted by Texas in Senate Bill No. 1126.  These revisions amend  the State's definition of "modification of existing facility" to exclude certain facility changes and exempts facilities from the obligation to obtain certain authorizations before engaging in modification. Specifically, under the revisions enacted in Senate Bill 1126, "modification of existing facility" does not include:

---

covered by the plan as necessary to assure that national ambient air quality standards are achieved. . . ."  42 U.S.C. § 7410(a)(2)(c).

[4] Major NSR means any new or modified source that is subject to nonattainment new source review (NNSR) or prevention of significant deterioration (PSD) of air quality under the CAA.  75 Fed. Reg. 19468.  Generally, a source is deemed major if it has a potential to emit in excess of 10 tons per year of any single hazardous air pollutant or 25 tons per year of any combination of hazardous air pollutants.  42 U.S.C. § 7412(a)(1).

No. 10-60459

(E) a physical change in, or change in the method of operation of, a facility that does not result in a net increase in allowable emissions of any air contaminant and that does not result in the emission of any air contaminant not previously emitted, provided that the facility:

(i) has received a preconstruction permit or permit amendment or has been exempted pursuant to Section 382.057 from preconstruction permit requirements no earlier than 120 months before the change will occur; or

(ii) uses, regardless of whether the facility has received a permit, an air pollution control method that is at least as effective as the best available control technology, considering technical practicability and economic reasonableness, that the board required or would have required for a facility of the same class or type as a condition of issuing a permit or permit amendment 120 months before the change will occur. . . .

Act of May 9, 1995. 74th Leg., R.S., ch. 150, § 1, § 382.003, 1995 Tex. Gen. Laws 997, 997-98.

The revisions further provide, in relevant part:

(b) In determining whether a proposed change at an existing facility that meets the criteria of Section 382.003(9)(E) results in a net increase in allowable emissions, the board shall consider the effect on emissions of:

(1) any air pollution control method applied to a facility;

(2) any decreases in allowable emissions from other facilities that have received a preconstruction permit or permit amendment no earlier than 120 months before the change will occur; and

(3) any decreases in actual emissions from other facilities that meet the criteria of Section 382.003(9)(E)(i) or (ii).

Act of May 9, 1995. 74th Leg., R.S., ch. 150, § 2, § 382.0512, 1995 Tex. Gen. Laws 997, 998.

These revisions were later adopted by the Texas Natural Resource Conservation Commission (TNRCC), the predecessor of the Texas Commission on Environmental Quality (TCEQ). The Guidance Document regarding the Modification of Existing Facilities Under Senate Bill 1126 provides in the

Purpose and Scope that the "legislative intent of SB 1126 was to provide additional flexibility to certain facilities to make physical and operational changes without a requirement to obtain a permit or other approval from TNRCC." The Guidance Document further provides the following: "SB 1126 revised the TCAA statutory definition of 'modification of existing facility' by adding three types of physical and operational changes that are not considered to be modifications, even if the change results in an increase in emissions." This document also maintains that "SB 1126 only revised the Texas 'minor new source review' program to allow some changes to be made without a requirement to obtain a permit or other 'approval' from the TNRCC."

BCCA cites *Florida Power & Light Company v. Costle*, 650 F.2d 579, 588 (5th Cir. Unit B 1981), for the proposition that the EPA "should defer to the state's interpretation of the terms of its air pollution control plan when said interpretation is consistent with the Clean Air Act." *Id.* However, in *Florida Power & Light*, the EPA was attempting to require Florida to incorporate a state-imposed two-year limitation on relief into an EPA-approved proposed revision of a SIP. Here the EPA has not approved the proposed revisions and was not attempting to require Texas to incorporate any state-imposed limitation.

BCCA states in its brief that, "[p]urporting to conduct a 'legal interpretation,' EPA disagreed that the Program is exclusively a Minor NSR program. 75 Fed. Reg. 19,476." Further, "EPA is not vested with expertise in 'legal interpretation' of state law, however, and it had no basis upon which to disregard Texas statutes, rules, and the TCEQ's position regarding the limited scope of the Program." BCCA is referring to the EPA's response to comments generally opposing the EPA proposal and the quoted portions are taken out of context. The full response said:

> EPA understands TCEQ's explanation of the origination of the Program in SB 1126. Nonetheless, the Qualified Facilities Program

No. 10-60459

must meet all Federal requirements under the CAA in order to be approvable. The fact that EPA failed to act on the Qualified Facilities Program SIP revision within the statutory timeframe does not dictate the action EPA must take on the Program at this time. We cannot approve a program that fails to meet the requirements of the CAA. As discussed throughout our proposal and this final notice, the current Qualified Facilities Program fails to meet all requirements. We disagree with commenters that the Qualified Facilities Program is exclusively a Minor NSR program, based upon the ambiguities in the Program's rules. Furthermore, EPA need not prove that the Program is actually used for major modifications. EPA is required to review a SIP revision submission for its compliance with the Act and EPA regulations. [Citations omitted]. This includes an analysis of the submitted regulations for their legal interpretation. The Program's rules are ambiguous and therefore do not adequately prohibit use under Major NSR. We recognize that TCEQ considers the Program to be a Minor NSR Program; however, the State admits that its rules are insufficient to limit the Program to Minor NSR. See 74 FR 48450, at 48456-48457; Section V.F. below for further information.

75 Fed. Reg. 19468, 19476 (EPA Apr. 14, 2010) (final rule) (to be codified at 40 C.F.R. pt. 52).

BCCA and Texas both point out that in a 1995 comment, the EPA said that Texas had adequately addressed the issue of preventing circumvention of Major NSR. However, the EPA said that after it sent that 1995 comment letter, State legislators significantly revised the Texas Clean Air Act.

Texas asserts that any attempt to circumvent Major NSR would constitute violations of Texas' Major NSR rules and its QFP. However, petitioners also state that the EPA is without authority to interpret Texas law. Notwithstanding Texas rules, the EPA ultimately found that Texas did not provide it with sufficient information to demonstrate that the program meets the statutory and regulatory requirements necessary for approval under 42 U.S.C. § 7410(*l*) of the federal CAA.

No. 10-60459

Texas asserts that States have great flexibility in creating their minor new source review programs and quotes 75 Fed. Reg. at 19,485 as follows: "We [EPA] agree that states have great flexibility to create their own Minor NSR SIP programs." Again, the context of this quote is very telling. The sentences immediately following say, "[h]owever, at a minimum, those Minor NSR SIP programs must meet all of the Federal requirements. Likewise, the Qualified Facilities Program must meet all Federal requirements under the CAA in order to be approvable." While Texas has flexibility, the QFP must meet all Federal requirements under the CAA.

The petitioners also assert that the EPA improperly imposes Major NSR netting[5] requirements. Texas takes issue with the EPA's use of Major NSR netting requirements to analyze the program's Minor NSR netting approvability "because these principles are designed to ensure that there is no interference with the NAAQS [national ambient air quality standards] and control strategies." 75 Fed. Reg. at 19,473. Texas then asserts that the "proper test for netting under minor new source review is whether the netting interferes with the national ambient air quality standards [NAAQS] and control strategies." While this is exactly what the Major NSR netting requirements are designed to ensure, again, the EPA found that the plan was not limited to Minor NSR. Further, as stated previously, petitioners conceded at oral argument that the plan does not state that it is explicitly limited to Minor NSR.

The petitioners rely heavily on *Train v. Natural Res. Def. Council*, 421 U.S. 60, 79, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975), for the following:

> The Act gives the Agency no authority to question the wisdom of a State's choices of emission limitations if they are part of a plan *which satisfies the standards of § 110(a)(2)* . . . . Thus, so long as the ultimate effect of a State's choice of emission limitations *is*

---

[5] Netting basically refers to the offsetting of emissions increases at one facility with a greater or equal reduction of emissions at another facility.

No. 10-60459

> *compliance with the national standards* for ambient air, the State is at liberty to adopt whatever mix of emission limitations it deems best suited to its particular situation.

*Id.* (Emphasis added). Here, the EPA found that the plan was not in compliance with the national standards.

BCCA asserts that the failure to cite an example of anyone attempting to use the plan to circumvent Major NSR thus far should prevent the EPA from suggesting that it could be used for such. The flaw in that argument is that the plan has not yet been approved by the EPA, a fact that in no way indicates that an improper attempt to circumvent Major NSR would somehow be prevented upon approval.

The EPA's factual findings are entitled to substantial deference and should be upheld if they are supported by the administrative record, even if there are alternative findings supported by the record. *See Arkansas v. Oklahoma*, 503 U.S. 91, 113, 112 S.Ct. 1046, 117 L.Ed.2d 239 (1992).[6] The record in this matter

---

[6] In his concurring opinion, Judge Southwick takes issue with any deference to the EPA, yet offers no applicable authority for his assertion that the EPA is not entitled to deference. Instead, he cites dictum in a footnote quoting a portion of a law journal article in *United States v. Mead Corp.*, 533 U.S. 218, 230, n. 11 (2001), a tariff classification case from The Court of International Trade. In *Mead*, the Supreme Court found *Chevron* deference inapplicable for reasons not existing in the EPA case before us. ( "There are, nonetheless, ample reasons to deny *Chevron* deference here. The authorization for classification rulings, and Customs's practice in making them, present a case far removed not only from notice-and-comment process, but from any other circumstances reasonably suggesting that Congress ever thought of classification rulings as deserving the deference claimed for them here." *Id.* at 231.) Judge Southwick also cites *Mayo Found. for Med. Educ. & Research v. United States*, 131 S.Ct. 704, 714 (2011). However, in *Mayo*, the Supreme Court found that the agency rule at issue merited *Chevron* deference, saying: "In the *Long Island Care* case, we found that *Chevron* provided the appropriate standard of review where an agency rule sets forth important individual rights and duties, where the agency focuses fully and directly upon the issue, where the agency uses full notice-and-comment procedures to promulgate a rule, and where the resulting rule falls within the statutory grant of authority. These same considerations point to the same result here. This case falls squarely within the bounds of, and is properly analyzed under, *Chevron* and *Mead*." *Mayo*, 131 S.Ct. at 714 (internal marks and citations omitted). As in *Mayo*, the instant case falls squarely within the bounds of *Chevron* and deference applies.

establishes that the EPA considered the relevant factors in disapproving the program, that the action bears a rational relationship to the purpose of the statute, and that there is substantial evidence in the record to support it. Despite any interpretations to the contrary, the relevant portions of Senate Bill 1126 quoted previously herein support the EPA's finding that the revisions are not clearly limited to Minor NSR.

## CONCLUSION

For the foregoing reasons, we deny the petitions for review and uphold the EPA's action disapproving the plan revisions.

DENIED.

No. 10-60459

LESLIE H. SOUTHWICK, Circuit Judge, concurring in the judgment:

I agree we should deny the petition for review. Respectfully, my reasoning differs from that of the majority.

After notice and comment, EPA offered four reasons for disapproving the Qualified Facilities Program (QFP) as a Minor New Source Review (NSR) revision to Texas's state implementation plan (SIP): (1) the regulatory text permits evasion of Major NSR requirements; (2) its "netting" features jeopardize attainment and maintenance of national ambient air quality standards (NAAQS); (3) Texas did not furnish the necessary data and modeling to predict whether the QFP's impact on future air quality would truly be *de minimis*; and (4) the definition of "facility" in the program was overly broad. *See* 75 Fed. Reg. 19,468, 19,473-19,474 (Apr. 14, 2010) (to be codified at 40 C.F.R. pt. 52). I do not join the majority in ratifying the first of these. Also, like the majority, I express no position on the final two. I conclude the problems identified by EPA with netting are sufficiently supported by the record and justify denial of the petition.

I.    *EPA's Legal Interpretation*

My concern with the majority's approach is that, central to its reasoning, we are taking sides in a dispute over drafting styles. Invoking *Chevron*, EPA argues that the court should defer to its "legal interpretation" that without explicit text warning that major sources may not use this program, the QFP cannot be understood solely to pertain to minor sources of pollution. 75 Fed. Reg. at 19,476, 19,469.

Texas rightly observes that express negative language is not the only way to convey a limitation. I see no reason to credit EPA for any expertise on whether Texas should express the purposes of this program in a negative or affirmative manner, so long as it is clear. For example, EPA has not pointed to evidence from its regulatory experiences that affirmative descriptions of plan coverage are less effective than negative statements. Experience might be a

No. 10-60459

foundation for expertise here, or at least be a basis for arguing it. On this record, I see nothing beyond a quibble. Without any historical pattern or other basis to support the preference, insisting on one expression compared to the other is arbitrary and, perhaps more accurately, capricious.

Texas still must have given an adequate affirmative explanation. It identified an applicant's affirmative obligation to comply with Major NSR requirements. *See Envtl. Conservation Org. v. City of Dallas*, 529 F.3d 519, 526 (5th Cir. 2008). It argues that the QFP requires persons modifying a qualified facility to keep documentation and information sufficient "to show that the project will comply with § 116.150 and § 116.151 of this title (relating to Nonattainment Review) and §§ 116.160-116.163 of this title (relating to Prevention of Significant Deterioration Review)." 30 Tex. Admin. Code § 116.117 (1998). These Nonattainment and so-called PSD programs only regulate major sources, leading EPA to refer to them "together as the major NSR program." 74 Fed. Reg. 51,418, 51,421 (Oct. 6, 2009) (to be codified at 40 C.F.R. pts. 70-71). The Texas Commission on Environmental Quality has always considered QFP to be exclusively a Minor NSR program. EPA acknowledges that fact. 75 Fed. Reg. at 19,476.

Confronted with a dispute between Texas and EPA about the meaning of the submitted SIP, the majority, implicitly as a matter of administrative deference, privileges EPA's construction. *E.g., Chevron, USA, Inc. v. NRDC*, 467 U.S. 837, 842-43 (1984). I would not. It is of some significance that the SIP is purely state law until approved; the Texas Legislature enacted it with Senate Bill 1126 – an amendment to the Texas Clean Air Act. This fact is not conclusive, since in a given situation EPA's environmental expertise might improve its understanding of a proposed SIP, warranting some deference.[1] As

---

[1] Under the APA, "our deference to the agency's expertise is significant," meaning that "a court reviewing an agency action may not substitute its own judgment for that of the

to whether the Texas Administrative Code codifies the prohibition that the Texas Commission on Environmental Quality claims it does, I do not believe EPA has special policy insight. There is no plausible account that Congress would have wished for EPA to "enjoy primary interpretational authority" as to how Texas law should express itself. *United States v. Mead Corp.*, 533 U.S. 218, 230 n.11 (2001) (quotation marks and citation omitted); *see also Mayo Found. for Med. Educ. & Research v. United States*, 131 S. Ct. 704, 714 (2011). The majority makes reasonable efforts to distinguish these authorities factually, as they are distinguishable, but does not support its own position that a federal agency would be owed *Chevron* deference in a situation such as this.

Though I do not agree that *Chevron* has any relevance here, I would prefer neither reaching that issue nor deciding which party has the more persuasive interpretation of the QFP. Even stipulating that the program is limited to Minor NSR, EPA's disapproval may stand under the APA.

I turn now, briefly, to why I believe that is so.

## II.    *Netting*

As an experiment in deregulation, the premise behind the QFP proposal is that physical changes that do "not result in a net increase in allowable emission[s]" are no longer defined as facility modifications. 30 Tex. Admin. Code § 116.10(11)(E) (2002). As a consequence, they avoid the need to secure a Minor NSR permit under one of the mechanisms provided for in the already approved SIP. Credible netting is thus the glue that holds the program together.

EPA "disapprove[d] netting under the Qualified Facilities Program as a Minor NSR program, in part because the Program fail[ed] to ensure that ambient air is protected in consideration of all changes in the netting." 75 Fed.

---

agency." *La. Envtl. Action Network v. EPA*, 382 F.3d 575, 582 (5th Cir. 2004).

No. 10-60459

Reg. at 19,477. At least two particular faults in QFP netting identified in the final rule stand out as valid, justifying agency disapproval.

First, the program "fails to define a contemporaneous period or require that emission reductions occur within a specified period." 75 Fed. Reg. at 19,478. In other words, the program does not specify the time frame for when a pollution increase must be offset. Unlike as to Major NSR evasion, this is not a matter of interpretation, but rather of complete statutory and regulatory silence.[2]

Second, EPA found a weakness in the pollutant interchange methodology, a technical subject at the heart of its environmental expertise. QFP permits "[e]missions of different compounds within the same air contaminant category" to be interchanged. 30 Tex. Admin. Code § 116.116(e)(3)(B) (2000). An "air contaminant category" is defined as "a group of related compounds, such as volatile organic compounds, particulate matter, nitrogen oxides, and sulfur compounds." § 116.116(e)(3)(F). Because the term "sulfur compounds" embraces both hydrogen sulfide and sulfur dioxide, EPA reasonably concluded that this definition would jeopardize the NAAQS for sulfur dioxide. By the same token, the general category "particulate matter" would permit increases of smaller particulate (PM-2.5) to be offset by reductions in larger ones (PM-10). Different NAAQS govern PM-2.5 and PM-10, because generally the more fine a particulate, the more deleterious to human health.

Establishing, monitoring, and enforcing the nation's air quality standards is EPA's central charge under the Clean Air Act. State SIPs are the means to

---

[2] As this court recently recognized, "extensive and complex" requirements govern Major NSR, while "[i]n stark contrast, the CAA [Clean Air Act] prescribes only the barest of requirements for 'minor' NSR." *Luminant Generation Co. v. EPA*, 675 F.3d 917, 922 (5th Cir. 2012). Thus, Texas is correct that EPA may not condition Minor NSR approval on features imported from Major NSR, as this would upset the statutory scheme. While references to "contemporaneous" reductions are indeed found in the Major NSR rules, 40 C.F.R. § 51.165(a)(1)(vi)(A)(2), offsets without some time-equivalence cannot in any logical sense be said to be net-neutral. As such, EPA is justified in insisting on this bedrock feature, dictated by common sense.

these ends, and EPA "shall not approve a revision" to a SIP if it "would interfere" with NAAQS. *See* 42 U.S.C. § 7410(a)(*l*). In accord with this statutory mandate, in terms of timing and how pollutants are defined, EPA found that the QFP would undermine specific NAAQS. Because these conclusions are rooted in agency expertise, adequately explained, and based on the congressionally prescribed factors, our duty is to uphold EPA's final action to disapprove. *See Luminant*, 675 F.3d at 925 (discussing the court's purview under the APA, 5 U.S.C. § 706).

I therefore concur in the judgment.