# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 6, 2010

No. 09-60108

Lyle W. Cayce
Clerk

MEDINA COUNTY ENVIRONMENTAL ACTION ASSOCIATION

Petitioner

v.

SURFACE TRANSPORTATION BOARD; UNITED STATES OF AMERICA;
UNITED STATES FISH AND WILDLIFE SERVICE

Respondents

---

Petition for Review of a Decision of the
United States Surface Transportation Board

---

Before KING, BARKSDALE, and ELROD, Circuit Judges.

KING, Circuit Judge:

The petitioner, the Medina County Environmental Action Association (MCEAA), seeks review of a Construction and Operation Exemption Decision (the Decision) entered by one of the respondents, the Surface Transportation Board (STB). The Decision granted an exemption under 49 U.S.C. § 10502 that allows the intervenor, Southwest Gulf Railroad Co. (SGR), to construct and operate a seven-mile rail line and rail loading loop to service a proposed limestone quarry in Medina County, Texas, without meeting the prior approval

No. 09-60108

requirements imposed by 49 U.S.C. § 10901.[1]  MCEAA petitions this court directly for review of the Decision, as it may under 28 U.S.C. §§ 2321(a), 2342(5).

At issue is whether the STB and the second respondent, the United States Fish and Wildlife Service (FWS),[2] complied with their obligations under § 7 of the Endangered Species Act (ESA) to ensure that the proposed rail was "not likely to jeopardize the continued existence of any endangered species" before approving the exemption.  16 U.S.C. § 1536(a)(2).  Specifically, MCEAA challenges the respondents' finding that the proposed rail and its "cumulative effects" are not likely to jeopardize the continued existence of the endangered golden-cheeked warbler, which is known to exist in Medina County, and of certain endangered karst invertebrates, which are known to exist in neighboring Bexar County.  Also pending is MCEAA's motion to supplement the administrative record.  For the reasons discussed below, we deny MCEAA's petition for review of the Decision and deny the motion to supplement.

## I.  Background

### A.    The Proposed Quarry and Rail Line

In 1999, Vulcan Construction Materials, LP (Vulcan), not a party to this case, entered into long-term leases for three contiguous pieces of property in north central Medina County, north of the unincorporated settlement of Quihi,

---

[1] Section 10901 requires that a party file a public application and obtain the STB's certification that the proposed project is not "inconsistent with the public convenience and necessity" before constructing a railroad line.  49 U.S.C. § 10901(c).  Section 10502 permits an exemption from the authorization requirements if the STB determines that the proposed rail "is not necessary to carry out the [government's] transportation policy" goals and either the transaction or service is of limited scope or the project does not create a need "to protect shippers from the abuse of market power."  49 U.S.C. § 10502(a).  Neither of these statutes is central to the disposition of this case.

[2] The United States of America is named as a third respondent.

No. 09-60108

Texas. Vulcan intends to develop this combined 1,760-acre tract as a limestone quarry in a phased approach. In "Phase One," Vulcan will develop the southernmost 640 acres of the site, approximately twenty percent of the total land area. The development will include a quarry pit, fuel storage area, plant maintenance facility, and production facility. Vulcan has indicated that it may quarry the rest of the site in up to four additional phases over the course of the next 50 years if there is market demand, but at present it has no specific plans for further development. SGR, which is owned by Vulcan's parent company, Vulcan Materials Co., seeks to build a seven-mile rail line and loading loop on the Phase One area and easements to the south that would connect the quarry with the Union Pacific Railway main line, along U.S. 90 at Dunlavy, Texas.[3] MCEAA, a Texas non-profit corporation, was formed in 2000 to oppose the construction and operation of the quarry. Its members consist primarily of individuals in Quihi, Texas, who live or own land adjacent to or near the site of the proposed quarry and rail.[4]

---

[3] Although the present plans only involve connecting the quarry to the main line, SGR asserts that ultimately it intends to "hold itself out as a common carrier . . . to provide service to other industries that might locate along the line in the future."

[4] MCEAA asserts direct standing based on its mission "to protect the flora and fauna of the Quihi area" and to "preserve the quality of life that has been a part of Medina County's heritage." MCEAA also asserts standing on behalf of its members on two bases. First, MCEAA asserts that its members have enjoyed observing golden-cheeked warblers in the area and will be harmed if the warblers are harmed or driven away by the quarry. Second, MCEAA contends that the activities at the proposed quarry will drive the warblers onto its members' own properties. Because the ESA imposes on private landowners a prohibition against harming endangered species, 16 U.S.C. §§ 1532, 1538, MCEAA argues that the presence of warblers on its members' properties would prevent them from clearing and developing their land for ranching and farming. The respondents do not dispute that MCEAA has standing to pursue this petition for review, and MCEAA's contentions as to esthetic and pecuniary harm are in fact sufficient to support standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 563 (1992); *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586–87 (5th Cir. 2006).

No. 09-60108

Among the numerous challenges that MCEAA raised in opposition to the proposed quarry is that the quarry could threaten the endangered golden-cheeked warbler.  In an effort to avoid this possibility, Vulcan began a voluntary consultation in 2000 with the FWS, seeking to structure the development of the quarry in compliance with § 9 of the ESA, which makes it "unlawful for any person subject to the jurisdiction of the United States to . . . take any [endangered] species within the United States."  16 U.S.C. § 1538(a)(1)(B).  "Take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  *Id.* § 1532(19).  "Harm," in turn, includes "significant habitat modification or degradation [that] actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering."  50 C.F.R. § 17.3.  The ESA imposes strict penalties for § 9 violations, including criminal penalties of up to one year in prison and a $50,000 fine per violation and civil penalties of up to $25,000 per violation.  16 U.S.C. § 1540(a), (b).  Citizens may also bring civil suits to enjoin violators or to compel the FWS to enforce the statute against violators.  *Id.* § 1540(g).  If a proposed project is likely to result in "take" of a species or habitat, an applicant may petition the FWS under § 10 of the ESA for a permit, under "such terms and conditions as [the FWS] deems necessary or appropriate," that allows the project to proceed with some degree of "take."  *Id.* § 1539(a)(2)(B).

On April 16, 2001, at Vulcan's request, officials from FWS's Austin field office accompanied a geologist for Vulcan to the proposed quarry site to study the potential for the project to harm the golden-cheeked warbler.  Vulcan proceeded, with the FWS's advice and guidance, to conduct intensive surveys of the Phase One area but found no warblers and little or no habitat that would support

4

warblers. Vulcan also conducted preliminary "screening" surveys on the rest of the 1,760-acre tract and again found no warblers, although the northern portion of the tract did contain some suitable habitat. Vulcan submitted the results of these surveys in a report to the FWS on October 2001. The report also described four additional phases for potential development to occur over the next twenty to fifty years, but indicated that there were not yet any specific development plans for those phases. Vulcan stated that it would begin conducting intensive surveys of future phases a minimum of three years before commencing development. The FWS responded to the report by letter on March 20, 2002, expressing approval of the survey work and the phased approach.[5]

Vulcan published another report in August 2003 that described the results of intensive surveys of the Phase One area conducted in 2002 and 2003. As in the prior report, Vulcan reported that no golden-cheeked warblers were found and that the potential warbler habitat within the Phase One area was "poor to marginal." The report did disclose, however, that one warbler had been heard calling on one occasion from the northeast of the Phase One site in 2003. On

---

[5] The FWS stated in the March 20, 2002, letter when expressing approval for the phased approach that "[t]ypically the [FWS] requires that adequate assessments for endangered species be conducted for all phases or segments for a particular project up front, before any habitat destruction or 'take' of endangered species is authorized on any part of the project." MCEAA contends that this sentence shows that the FWS unlawfully "permitted" Vulcan to proceed with a phased approach rather than surveying the entire quarry at the outset. But this misconstrues the sentence and the facts. At that time, the FWS was involved with the project only because Vulcan had voluntarily requested its advice. By that sentence, the FWS meant only that ordinarily, the FWS will not grant a permit under § 10 of the ESA to engage in "take" until a survey of the entire proposed project has been conducted. Vulcan had not yet sought (and has not, to this court's knowledge, since sought) a permit under § 10. Whether or not the FWS should have permitted a phased approach (and MCEAA points to no statute or regulation suggesting that a § 10 permit cannot be issued after only a phased survey) is not relevant unless and until Vulcan seeks such a permit.

October 17, 2003, the FWS provided feedback on the report by letter, noting that the report's conclusions as to the absence of warblers on the property were consistent with the observations of its own field agents, who had toured portions of the property just two days earlier.

## B.    Evaluation of the Proposed Rail Line for the § 10901 Exemption

On February 27, 2003, SGR petitioned the STB for an exemption under 49 U.S.C. § 10901 to construct a seven-mile rail line and loading loop, to be located in the Phase One area and on easements to the south, to service the proposed quarry.  The STB quickly determined that SGR met the statutory requirements for exemption and granted conditional approval, contingent upon a determination that the approval would not violate the STB's obligations under § 7 of the ESA.  Section 7 imposes an affirmative duty on federal agencies to ensure that their "actions" are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species."  16 U.S.C. § 1536(a)(2).[6]  An agency "action" includes "the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid" to private parties.  50 C.F.R. § 402.02.  Because granting the exemption that SGR sought would qualify as an "action" under the regulations, the STB was required to assess the § 7 ramifications of the proposed rail.  The STB's approval was not required for any other action associated with the proposed quarry, and the parties have not pointed to any

---

[6] The ESA regulations define "jeopardize the continued existence of" as  "engag[ing] in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."  50 C.F.R. § 402.02.

No. 09-60108

other aspect of the proposed quarry that required or will require approval under § 7.

### 1.    The STB's Informal Consultation with the FWS

In assessing whether the proposed rail line and loading loop were "likely to jeopardize" endangered or threatened species or their habitats, the STB was required to consult with the FWS. 16 U.S.C. § 1536(a)(2).[7] The STB initiated an "informal consultation"[8] with the FWS on March 31, 2003. In the first step of an informal consultation, the agency must determine whether an endangered or threatened species, or "critical habitat"[9] for such species, may be present in the vicinity of the proposed action. *Id.* § 1536(c)(1); 50 C.F.R. § 402.13(a). If no such species or critical habitat may be present, no further consultation is

---

[7] The statute states that the agency conducting a § 7 analysis must consult with the Secretary of the Interior. 16 U.S.C. §§ 1532(15), 1536(a)(2). The FWS is a bureau of the Department of the Interior, tasked with conducting § 7 consultations. For ease of reference, throughout this opinion, statutory references to "the Secretary" are treated as references to the FWS.

[8] An "informal consultation" is "an optional process that includes all discussions, correspondence, etc., between the [FWS] and the Federal agency . . . designed to assist the Federal agency in determining whether formal consultation or a conference is required." 50 C.F.R. § 402.13. As here, most consultations between a federal agency and the FWS begin as informal consultations. If the agency and FWS do not agree after informal consultation that the proposed action is not likely to adversely affect listed species, then a formal consultation is required. *Id.* § 402.14.

[9] "Critical habitat" is defined as "the specific areas within the geographical area occupied by the species . . . on which are found those physical or biological features . . . essential to the conservation of the species and . . . which may require special management considerations or protection." 16 U.S.C. § 1532(5)(A)(i).

No. 09-60108

required; if they may be present, then the informal consultation proceeds to the second step.  50 C.F.R. § 402.13.[10]

On April 22, 2003, the FWS informed the STB that the endangered golden-cheeked warbler was listed in FWS records as being present in Medina County,[11] although no designated critical habitat for the warbler (or for any other species) was listed in the vicinity of the proposed action.  The FWS indicated that most of the area around the proposed rail line had previously been cleared for agriculture and did not offer supportive habitat for the warbler, but that a small portion of land near the proposed loading loop had not been cleared and might provide such habitat.  The FWS requested that the STB conduct a habitat assessment and bird surveys in the area of the entire proposed action.  In a subsequent letter, the FWS also informed the STB that certain endangered karst invertebrate species,[12] though not listed as present in Medina County, were listed in FWS records as being present in neighboring Bexar County.  These listed karst invertebrates depend on the Edwards Aquifer, a large karst aquifer

---

[10] *See also* U.S. Fish & Wildlife Service, Endangered Species Program, *Consultations with Federal Agencies: Frequently Asked Questions*, at http://www.fws.gov/Endangered/consultations/sec7_faq.html#2 (last visited Mar. 15, 2010).

[11] The black-capped vireo was also listed as being present in Medina County, but MCEAA does not assert that the proposed rail has the potential to jeopardize the continued existence of this species.

[12] Karst is a type of land formation formed by the dissolution of soluble rocks, including limestone and dolomite.  Karst invertebrates are capable of surviving only in karstic caves or rock.  The listed karst invertebrate species described in the FWS letter include the Comal Springs dryopid beetle, the Comal Springs riffle beetle, the Fountain darter, the Peck's cave amphipod, and the San Marcos gambusia.  The FWS also recommended that the STB assess impacts on three other endangered or threatened species that rely on the Edwards Aquifer and its associated springs, including the San Marcos salamander, the Texas blind salamander, and Texas wild rice.  MCEAA has not raised any challenge as to these three species.

8

No. 09-60108

that spans several counties, including Medina County, and that receives some recharge water from the site of the proposed quarry. The FWS was concerned that these listed karst invertebrates could be adversely impacted if the proposed action tainted groundwater at the quarry site or damaged karst features on the property connected to the Edwards Aquifer. The FWS urged the STB to consider the effects of the proposed action on groundwater, to survey the site for karst features, and to evaluate, if karst features were present, the possible impact of the proposed action on those features.

Because the golden-cheeked warbler was listed as being present in Medina County and because there was potential for the proposed action to affect the habitat of listed karst invertebrates in neighboring Bexar County, the informal consultation proceeded to the second step, in which the STB was required to conduct a "biological assessment" of the effects of the proposed action. 16 U.S.C. § 1536(c)(1). The particular contents of a biological assessment "are at the discretion of the Federal agency[,] . . . depend[ing] on the nature of the Federal action," but "may" include "[a]n analysis of the effects of the action on the species and habitat, including consideration of cumulative effects, and the results of any related studies." 50 C.F.R. § 402.12(f). "Effects of the action" are "the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action." *Id.* § 402.02. "Indirect effects," in turn, are "those that are caused by the proposed action and are later in time, but still are reasonably certain to occur." *Id.* "Interrelated actions" are "those that are part of a larger action and depend on the larger action for their justification." *Id.* "Cumulative effects" are "those effects of future State or private activities, not

9

No. 09-60108

involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." *Id.*

The ESA regulations permit an agency to conduct a biological assessment as part of an "Environmental Impact Statement" (EIS) prepared in compliance with the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*[13] 50 C.F.R. § 402.12(g). The STB opted to do so in this case. In preparing an EIS to comply with NEPA, an agency must consider, among other things, the "cumulative impacts" of the proposed action, defined as:

> the impact on the environment which results from the incremental impact of the action when added to other past, present, and *reasonably foreseeable* future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7 (emphasis added). In assessing the proposed action, the STB's review of "cumulative impacts" ("reasonably foreseeable future actions")

---

[13] NEPA is a procedural statute that requires a federal agency contemplating a "major Federal action[ ] significantly affecting the quality of the human environment" to take environmental considerations into account in its decisionmaking process. 42 U.S.C. § 4332(2)(C). NEPA provides that "all agencies of the Federal Government shall":

> include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
>> (i) the environmental impact of the proposed action,
>> (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
>> (iii) alternatives to the proposed action,
>> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
>> (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

*Id.*

No. 09-60108

under NEPA encompassed its review of "cumulative effects" (actions "reasonably certain to occur") under the ESA. *See* Interagency Cooperation—Endangered Species Act of 1973, as Amended; Final Rule, 51 Fed. Reg. 19926, 19933, 1986 WL 93097 (June 3, 1986) (codified at 50 C.F.R. Part 402) (characterizing "cumulative impact" review as requiring a broader inquiry that encompasses a "cumulative effects" review).[14]   MCEAA does not allege a NEPA violation.

As part of the EIS, the STB[15] and an independent, third-party consultant, URS Corporation, conducted walking and aerial surveys of the various proposed routes for the seven-mile rail line and the site for the proposed loading loop. No golden-cheeked warblers were found. Almost no suitable warbler habitat was found, although the area just south of the proposed loading loop was dispersed woodland composed largely of juniper and oaks that the STB concluded had "low potential" to support warblers. The surveys also inspected the proposed rail routes and the Phase One area for karst features. The surveys revealed some karst features, but none that provided habitat for any endangered or threatened species.

---

[14] In its official comments to the ESA § 7 regulations, the FWS explained that NEPA's provisions are only procedural (requiring federal agencies to make environmental considerations part of the decision-making process), while the § 7 provisions of the ESA are substantive (an agency cannot take an action unless it is in compliance with the statute). 51 Fed. Reg. at 19933. The FWS reasoned that a narrower standard was necessary because "[o]therwise, in a particular situation, the jeopardy prohibition could operate to block 'nonjeopardy' actions because future, speculative effects occurring after the Federal action is over might, on a cumulative basis, jeopardize a listed species. Congress did not intend that Federal actions be precluded by such speculative actions. *Id.* MCEAA does not contend that the STB's analysis of cumulative impacts under NEPA was deficient.

[15] The EIS was actually conducted by the STB's Section of Environmental Analysis (SEA) and later adopted by the STB. For ease of reference, survey and analytic work conducted by the SEA is referred to throughout this opinion to as having been conducted by the STB.

No. 09-60108

## 2.    The EIS Documents

The STB ultimately prepared three EIS documents for the proposed rail. The STB circulated the first, a "Draft Environmental Impact Statement" (Draft EIS), for notice and comment on November 5, 2004. The Draft EIS assessed the possible environmental impacts of four alternative routes for the rail line and concluded that none was likely to adversely affect the golden-cheeked warbler or listed karst invertebrates. The FWS concurred with the Draft EIS on May 19, 2005. On December 8, 2006, in response to concerns raised by MCEAA and others, the STB circulated for notice and comment a "Supplemental Environmental Impact Statement" (Supplemental EIS) that analyzed three additional proposed rail routes and concluded that these, too, were not likely to adversely affect any listed species. The FWS concurred with the Supplemental EIS on July 24, 2006. The STB issued a "Final Environmental Impact Statement" (Final EIS) on May 30, 2008, that incorporated large portions of the Draft EIS and Supplemental EIS and set forth additional research and conclusions. The FWS concurred with the Final EIS on September 11, 2008.[16]

---

[16] The FWS briefly withheld its concurrence from the Final EIS. On July 15, 2008, after reviewing the Final EIS, the field supervisor from the FWS field office wrote to the STB indicating that an FWS field officer had made a site visit to the quarry and was concerned that the proposed rail "might fall within a relatively large swatch of oak–juniper woodland that may support breeding pairs" of golden-cheeked warblers. A subsequent conversation with the STB, however, revealed that the field officer had visited one of the northernmost portions of the 1760-acre quarry tract, far from the proposed rail and the Phase One area. The STB clarified to the FWS that thorough surveys had been conducted of the proposed rail and Phase One areas both by STB and Vulcan and pointed out that the FWS had already concurred on several occasions that the proposed rail would not adversely affect the golden-cheeked warbler. After this confusion was addressed, the FWS officially concurred with the Final EIS's determination that the proposed action was not likely to adversely affect the golden-cheeked warbler or karst features. MCEAA urges the July 15, 2008 letter as a basis for concluding that FWS has lingering objections to the methodology and conclusions in the EIS. The letter does not provide such a basis.

The EIS documents concluded that the proposed action was not likely to jeopardize the continued existence of the golden-cheeked warbler or any karst invertebrates. The conclusions in the EIS documents were drawn from the results of the STB's own surveys and from the reports that Vulcan prepared in 2001 and 2003 with the advice and guidance of the FWS.

In concluding that the proposed action was not likely to jeopardize the continued existence of any listed species, the EIS documents specifically considered the cumulative impacts of the construction and operation of Phase One of the quarry. The STB declined to assess the rest of the proposed quarry in its cumulative impacts analysis, concluding that no other development was "reasonably foreseeable." The STB concluded in the EIS documents that the proposed rail line and the cumulative impact of the Phase One quarry activities were not likely to adversely affect the golden-cheeked warbler because no warblers had been found in the proposed action area, because little suitable habitat existed in that area, and because Vulcan had announced plans to set aside the portions of the site containing the most suitable habitat, including a 200-foot-wide border around the entire quarry, as a "buffer zone." The STB also concluded that the proposed rail line and the cumulative impact of the Phase One quarry activities were not likely to adversely affect karst invertebrates, despite the fact that a number of karst features were present on the property. The EIS documents reflect the STB's conclusion that any danger that these activities might pose to groundwater and karst features would be adequately mitigated under a Water Pollution Abatement Plan (WPAP) that Vulcan was required by the Texas Commission on Environmental Quality (TCEQ) to implement as a condition of operating the quarry. The STB also noted that no

No. 09-60108

listed species had been found in any of the karst features present in the Phase One area.

The EIS documents also contain the STB's assessment of the environmental impact of what the STB referred to as the "no-action" alternative. SGR contended that if the proposed rail project were not approved, Vulcan would proceed with Phase One of the quarry project using trucks to remove the limestone. SGR estimated that 1,700 truck runs per day, 850 loaded outbound and 850 unloaded inbound, would be required to service the approximately 5 million tons of limestone aggregate per year that SGR projected the quarry would produce in the "reasonably foreseeable future." SGR estimated that the same work could be accomplished by just four rail trips per day, two loaded outbound and two unloaded inbound. The STB credited these estimates after considering detailed submissions from SGR. In the Draft EIS, the STB noted that the no-action alternative would displace approximately 125 acres of brushland, which carried "the potential for greater displacement of wildlife habitat and populations" than the proposed rail routes. The STB also noted in the Draft EIS that the no-action alternative had greater potential than a rail line to increase "impervious cover" (ground that water cannot penetrate) which in turn could make the land less conducive to the development of karst features, although again, the threat would "likely be minimal." In the Final EIS, the STB extensively analyzed the physical and economic feasibility of the no-action alternative and concluded that "based on all the information available to date . . . truck transport of the limestone from [Vulcan's] quarry to the [Union Pacific] rail line would be feasible." It also found that "the available information shows that

No. 09-60108

[Vulcan] could (and would) transport the limestone by truck if the rail line were not built."

These findings as to the no-action alternative, which MCEAA does not seriously contest, highlight an important point that is easily lost in the technical and regulatory complexities of this case:  Because the STB's approval was not required for any other action associated with the proposed quarry, because no other aspect of the proposed quarry required approval under § 7, and because the quarry would go forward with or without the proposed rail, the implications of the STB's decision were relatively narrow.  The STB could grant the exemption, in which case development of the quarry would proceed with rail service; or deny the exemption, in which case quarry development would still proceed with service by truck—an alternative that all parties agree would be more environmentally invasive.  This court's sole task in evaluating the MCEAA's petition is to determine whether the choice that STB made was arbitrary and capricious.  5 U.S.C. § 706(2)(A).

The EIS documents also included detailed studies of the amounts of noise and vibration that the construction and operation activities would produce. The main purpose of the analysis was to determine whether and to what extent the noise and vibration would affect offsite residences and cultural resources, such as prehistoric sites.  The STB predicted that there was potential for adverse noise impact from the construction and operation of the rail line, but proposed numerous mitigation measures that would decrease disruption.  It also noted that the no-action alternative would produce more disruptive noise than any of the rail alternatives.  The STB also analyzed the cumulative impact of noise from the quarry.  Noise from the quarry is expected to include a once-daily, low-

15

frequency "thump" from blasting and factory noise from the production facility. The STB concluded that this noise "would not materially contribute to" the rail noise. The STB also predicted that there would be no adverse vibration effects from the construction and operation of the rail line. The STB speculated that pile driving from the rail construction could have adverse vibration effects on nearby water wells, but again listed mitigation measures that would minimize these effects. The STB further found that no vibration from the quarry operations would propagate outside the quarry boundary and therefore concluded that there would be no adverse cumulative impacts from the quarry operations. The STB did not specifically discuss whether and to what degree the predicted levels of noise and vibration might have on the golden-cheeked warbler or listed karst invertebrates.

### 3.    The Decision

The STB issued its Decision approving the 49 U.S.C. § 10502 exemption on December 17, 2008. The Decision adopted the environmental findings set out in the Final EIS and specified that the exemption was contingent upon SGR's agreement to fulfill 91 environmental mitigation conditions, including measures addressing biological resources. One such mitigation condition was that SGR was required to consult with a "karst feature specialist" and "implement appropriate mitigation measures" if it discovered any karst features during construction. The Decision also cited with approval the facts that Vulcan had promised the TCEQ that it would establish, as part of its WPAP, "naturally vegetated corridors and buffer zones," including a 200-foot-wide vegetation buffer around the perimeter of the site; and that Vulcan had promised not to

clear land during the warblers' breeding season, as part of a voluntary commitment to the FWS.

Although the STB's involvement with the proposed quarry ended with its grant of the exemption for the rail line and loading loop, the FWS's involvement is ongoing. At Vulcan's request, the FWS is continuing to work with Vulcan in an advisory capacity to ensure that Vulcan's actions at the quarry do not violate Vulcan's obligations under § 9 of the ESA. Although Vulcan's consultation and cooperation are voluntary, the penalties for violations of § 9—prison time, fines of up to $50,000 per violation, and the threat of citizen suits—provide powerful incentives for Vulcan to heed the FWS's advice.

## C.    MCEAA's Asserted Bases for Relief

On February 13, 2009, MCEAA timely filed a petition to appeal the STB's Decision, naming the STB and FWS as respondents. At issue is whether the STB, in granting the § 10502 exemption, reached an arbitrary and capricious conclusion that the activity that it was authorizing was "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2). Also at issue is whether the FWS, with which the STB was required to consult in rendering decision under § 7, *id.*, complied with its own § 7 obligations by concurring in the STB's determination that no such jeopardy was likely to occur. MCEAA's chief argument is that the STB and FWS should have assessed the potential for jeopardy posed by the entire 1,760-acre tract, not just the proposed rail and Phase One area. MCEAA also contends that the analysis that the STB conducted failed to assess the effects of noise and vibration on the warbler population; gave inadequate consideration to the

17

threats posed to karst invertebrates; and improperly relied on certain unenforceable mitigation conditions. Also pending is MCEAA's motion to supplement the administrative record with material that it contends the STB and FWS should have considered before rendering their decisions.

## II.  The Standard of Review

We review the STB's and FWS's determinations as to § 7 of the ESA under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 *et seq.*; *see also Sierra Club v. Glickman*, 67 F.3d 90, 95 (5th Cir. 1995). The APA prescribes a narrow and highly deferential standard. This court may not overturn the agencies' decisions unless they were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Under this standard, we must assure ourselves that the agency considered the relevant factors in making the decision, its action bears a rational relationship to the statute's purposes, and there is substantial evidence in the record to support it; but, we cannot substitute our judgment for that of the agency." *Pub. Citizen, Inc. v. U.S. E.P.A.*, 343 F.3d 449, 455 (5th Cir. 2003). Where an agency's particular technical expertise is involved, we are at our most deferential in reviewing the agency's findings. *Marsh v. Or. Natural Gas Res. Council*, 490 U.S. 360, 376–77 (1989). When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, we might find contrary views more persuasive. *Id.* at 378. "We will uphold an agency's actions if its reasons and policy choices satisfy minimum standards of rationality." *Pub. Citizen*, 343 F.3d at 455. "Absent evidence to the contrary, we presume that an agency has acted in accordance with its regulations." *Sierra Club v. U.S. Army Corps of Eng'rs*,

No. 09-60108

295 F.3d 1209, 1223 (11th Cir. 2002) (citing *Nicholson v. Brown*, 599 F.2d 639, 649 (5th Cir. 1979)).  The petitioner has the burden of proving that the agency's determination was arbitrary and capricious.  *Hartford Cas. Ins. Co. v. F.D.I.C.*, 21 F.3d 696, 704 (5th Cir. 1994).

## III.  Analysis

### A.  Whether the Scope of the Biological Assessment Rendered the Decision Arbitrary and Capricious

MCEAA argues that the STB's Decision was arbitrary and capricious because it relied on a biological assessment that assessed only the proposed rail and Phase One area.  MCEAA contends that to satisfy § 7 of the ESA and the accompanying regulations, the STB and FWS should have analyzed the effects of the proposed development of the entire 1,760-acre tract before concluding that the proposed rail was not likely to jeopardize the continued existence of the golden-cheeked warbler.  The respondents counter that the scope of the biological assessment was appropriate because it encompassed only those actions associated with the proposed rail that were reasonably certain to occur.

The ESA § 7 regulations leave the contents of a biological assessment (which here was conducted as part of the EIS) to the discretion of the evaluating agency.  The biological assessment "may" include "[a]n analysis of the effects of the action on the species and habitat, including consideration of cumulative effects, and the results of any related studies."  50 C.F.R. § 402.12(f)(4).  The "effects of the action" include direct and indirect effects, "together with the effects of other activities that are interrelated or interdependent with that action."  50 C.F.R. § 402.02.  MCEAA contends that the proposed development

19

No. 09-60108

of the entire tract should have been evaluated as an "interrelated action," a "cumulative effect," and an "indirect effect" of the proposed rail.[17]

### 1.    The Proposed Development of the Entire Tract is Not an "Interrelated Action"

MCEAA first contends that the biological assessment should have evaluated the proposed development of the entire tract because the entire proposed quarry is an "interrelated action" with the proposed rail line. The ESA regulations define an interrelated action as being "part of a larger action and depend[ing] on the larger action for [its] justification." *Id.* Our circuit has not yet interpreted the term "interrelated action," but the FWS's Endangered Species Consultation Handbook clarifies that the "larger action" is the proposed action for which the agency has been called upon to grant approval:

> It is important to remember that interrelated . . . activities are measured against the **proposed action**. That is, the relevant inquiry is whether the activity in question should be analyzed with the effects of the action under consultation because it is interrelated to . . . the proposed action. Be careful not to reverse the analysis by

---

[17] MCEAA also argues that the entire quarry tract should have been considered as part of the "environmental baseline" of the proposed rail project. An "environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area . . . and the impact of State or private actions which are contemporaneous with the consultation in process." 50 C.F.R. § 402.02. The proposed development of the 1,760-acre tract is not a "past," "present," or "contemporaneous" activity and therefore should not be treated as part of the environmental baseline. In any event, it is unclear why MCEAA would want the projected activity to be considered as part of the environmental baseline, as it is *against* this baseline that interrelated actions, cumulative effects, and indirect effects are to be measured. *Id.*

MCEAA also accuses the respondents of failing to consider the WPAP as a "related study," as it may under 50 C.F.R. § 402.12(f)(4). There is no basis for this contention—the EIS documents show that the STB carefully considered the WPAP, particularly for the mitigation requirements relating to groundwater and karst features that it imposes on Vulcan.

analyzing the relationship of the proposed action against the other activity.

*See* U.S. Fish & Wildlife Service, Section 7 Consultation Handbook at 4-26 (1998) (emphasis in original) (hereinafter "FWS Handbook").[18]   The FWS's comments to the regulations further indicate that "the 'but for' test should be used to assess whether an activity is interrelated with . . . the proposed action." 51 Fed. Reg. at 19932.  The Ninth Circuit, the only circuit to have interpreted the term, has adopted this definition.  *See Sierra Club. v. Marsh*, 816 F.2d 1376, 1387 (9th Cir. 1987) ("The test for interrelatedness . . . is 'but for' causation: but for the [proposed action], these activities would not occur."  (citing 51 Fed. Reg. at 19,932)).   Although interpretations contained in agency manuals and comments are not entitled to the highest level of deference, a court may nevertheless defer to an agency's interpretation of its own regulation, depending upon "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."  *United States v. Mead Corp.*, 533 U.S. 218, 227–230 (2001) (internal quotation marks omitted). Applying this standard, we conclude that the FWS's interpretation is a reasonable construction of the regulation and entitled to deference.  We adopt this interpretation.

MCEAA contends that the proposed development of the entire tract is an "interrelated action" with the proposed rail because "[t]he rail line has no independent utility without all of the phases of the quarry."  But this contention

_____

[18] The FWS Handbook is available at:
http://www.fws.gov/endangered/pdfs/Sec7/handbook/CH4.PDF (last visited Mar. 15, 2010).

No. 09-60108

reverses the relevant analysis.[19]  The "larger action" is the proposed rail, the activity that the STB was called upon to approve.  The issue, for purposes of determining whether proposed development of the entire tract was an interrelated action, is whether, but for the proposed rail, development of the tract as a quarry would occur.  If development of the tract would not depend on the proposed rail, then the tract does not qualify as an interrelated action.  The STB specifically found, after considering detailed submissions by SGR, that Vulcan feasibly could operate the quarry without a rail, using trucks to remove the limestone.  The STB also found that Vulcan likely would take this course if the rail exemption were not granted.  The respondents' refusal to consider the proposed development of the entire tract as an "interrelated action" did not render the Decision arbitrary and capricious.

2.    **The Proposed Development of the Entire Tract is Not a "Cumulative Effect"**

MCEAA next argues that the proposed development of the entire tract should have been evaluated as one of the "cumulative effects" of the proposed rail.  The ESA regulations define "cumulative effects" as "those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation."  50 C.F.R. § 402.02.  MCEAA contends that "[o]nce the rail line is in place, it is certain that production from all phases of the quarry will use it over the remainder of the quarry's operation."  The respondents counter that only Phase One is "reasonably certain to occur."  The proposed phases of later

_____

[19] This contention is also contradicted by explicit findings by the STB that the railroad was in fact feasible even when considering only the output of the quarry for the "reasonably foreseeable future."

development, the respondents contend, are simply too speculative to allow the agencies to conduct a meaningful review. The respondents point out that although Vulcan has suggested a five-phase course of development, it has not "explicitly la[id] out any plan for [later] phases of development or operations" and has not specified when such development might occur, except that if it does occur, it will do so in the next 20 to 50 years. The respondents also note that future development "will likely depend on economic conditions, which are of course beyond the control or predictive ability of either the [FWS] or STB."

The Endangered Species Handbook explains that "[i]ndicators of actions 'reasonably certain to occur' may include":

> approval of the action by State, tribal or local agencies or governments (e.g., permits, grants); indications by State, tribal or local agencies or governments that granting authority for the action is imminent; project sponsors' assurance the action will proceed; obligation of venture capital; or initiation of contracts. The more State, tribal or local administrative discretion remaining to be exercised before a proposed non-Federal action can proceed, the less there is a reasonable certainty the project will be authorized. Speculative non-Federal actions that may never be implemented are not factored into the "cumulative effects" analysis. At the same time, "reasonably certain to occur" does not require a guarantee the action will occur. The action agency and the Services should consider the economic, administrative, and legal hurdles remaining before the action proceeds.

FWS Handbook at 4-30.

Our circuit has not interpreted the term "reasonably certain to occur," but it has interpreted the "reasonably foreseeable" standard for assessing cumulative impacts under NEPA, 40 C.F.R. § 1508.7, a standard that applies in a broader set of circumstances but encompasses the "cumulative effects" standard under the ESA—actions "reasonably certain to occur" are also

"reasonably foreseeable." *See* 51 Fed. Reg. at 19933. Our case law shows that even the broader "reasonably foreseeable" standard requires a substantial degree of certainty before a cumulative impacts analysis will be required. In *Gulf Restoration Network v. United States Department of Transportation*, 452 F.3d 362 (5th Cir. 2006), for example, we concluded that the federal agency's decision was not arbitrary and capricious when the agency had refused to consider, as part of its cumulative impacts analysis for a liquified underwater natural gas facility, three similar facilities that were proposed to be built in the same area. Applications for federal regulatory approval of these facilities had been filed, and we acknowledged that these applications contained substantial detail about the potential scope of the projects. We nevertheless deferred to the agency's conclusion that until final approval was granted on those applications, there was "insufficient certainty about the [facilities'] future construction and environmental consequences to include [them] in the cumulative impact calculus." *Id.* at 369. We noted that the applications could ultimately be denied or approved contingent upon substantial modifications, and that even if approved, the projects might not go forward because of financing issues. *Id.* at 371–72.

As the petitioner, MCEAA has the burden of showing that the proposed development of the entire tract should have been treated as a cumulative effect because its development as a quarry is reasonably certain to occur. MCEAA argues that development of the entire tract is reasonably certain to occur because Vulcan has entered into long-term leases for it. But the fact of the long-term leases is not tantamount to a reasonable certainty that financial incentives will exist in the future to develop the land—certainly not in any way sufficiently

No. 09-60108

specific for the respondents to conduct a meaningful scientific assessment of the development's effects.

MCEAA also argues, for the first time in its reply brief, that a map that Vulcan submitted to the TCEQ as part of its proposed WPAP shows specific plans for development of the entire tract. The map identifies karst features on the property and shows where those features are in relation to proposed quarry pits over the entire tract. We need not address this argument, as it is raised for the first time in a reply brief, *see Alaniz v. Zamora–Quezada*, 591 F.3d 761, 777 (5th Cir. 2009) (citing *Peteet v. Dow Chem. Co.*, 868 F.2d 1428, 1437 (5th Cir. 1989)), but in any event, this argument is not persuasive. SGR clarified at oral argument that the TCEQ required a review of the proposed plans for the entire tract before awarding regulatory approval to begin quarry activities on the site, and that the plans submitted merely reflected Vulcan's best guess about how the tract would be developed, if it were developed.

MCEAA also overlooks one significant contingency to the development of future quarry phases: If golden-cheeked warblers or karst invertebrates are found to live on this land, then Vulcan will be obligated under § 9 to avoid any "take," which may in turn preclude or inhibit development of the land. In this respect, time may work in the MCEAA's favor: warblers may move on to the unsurveyed portions of the property before any survey work is done. There is every indication that if future surveys reveal the presence of warblers, Vulcan's § 9 obligations will be strictly enforced—the FWS is monitoring Vulcan in an ongoing capacity, and the MCEAA may bring a citizens' suit to enforce compliance. 16 U.S.C. § 1540(g).

No. 09-60108

The STB's and FWS's refusal to consider the proposed development of the entire tract as a "cumulative effect" of the proposed rail did not render the Decision arbitrary and capricious. As in *Gulf Restoration*, MCEAA has not shown that the future phrases of the quarry are free from regulatory and financial contingencies such that their occurrence would be reasonably foreseeable, much less reasonably certain. We are persuaded that the respondents' refusal to consider the proposed development of the entire tract as a "cumulative effect" of the proposed rail did not render the Decision arbitrary and capricious.

### 3.    The Proposed Development of the Entire Tract is Not an "Indirect Effect"

Finally, MCEAA contends that the proposed development of the entire tract should have been evaluated as an "indirect effect" of the proposed rail. The ESA regulations define "indirect effects" as "those that are caused by the proposed action and are later in time, but still are reasonably certain to occur." 50 C.F.R. § 402.02. MCEAA cites *National Wildlife Federation v. Coleman*, 529 F.2d 359 (5th Cir. 1976), in support of this contention, but *Coleman* is readily distinguishable. *Coleman* involved the proposed expansion of Interstate 10 through a stretch of designated critical habitat for the Mississippi sandhill crane, a federally-listed subspecies. Despite the presence of a listed species and critical habitat in the action area, the Federal Highway Administration (FHA) approved the project without ever initiating a consultation with the FWS. The FWS in fact opposed the project on the grounds that the project would jeopardize the continued existence of the cranes. *Id*. at 372–73. Our court reversed the FHA's approval and remanded with directions that the agency properly consult with the FWS and consider, as an "indirect effect" of the action, the effects of

26

future private development along the highway, which the FWS urged "*always* accompanies the construction of a major highway." *Id*. at 373 (emphasis added).[20]  In the present case, by contrast, the STB concluded after extensive analysis that the proposed action was not likely to jeopardize any listed species and the FWS concurred in that conclusion.  And, as discussed in the above analysis as to cumulative effects, the STB and FWS reasonably determined that the development of the remaining phases of the quarry is not "reasonably certain to occur"—the same standard applicable to "indirect effects."  The record, in sum, does not support the conclusion that the STB's and FWS's refusal to consider the proposed development of the entire tract as an "indirect effect" rendered the Decision arbitrary and capricious.

The complexities of the regulatory arguments on this issue also obscure a fundamental point:  The STB has no authority to stop development of the quarry, which the evidence shows could and would be developed regardless of whether the rail line were built.  The STB had two choices:  Grant the exemption and allow the rail line—the environmentally preferable alternative—to go forward, or deny the exemption, in which case quarry development would progress, serviced by a more environmentally disruptive fleet of trucks.  We cannot say that the STB abused its discretion in choosing the former.

**B.    Whether the Effects Analysis Rendered the Decision Arbitrary and Capricious**

---

[20] MCEAA also cites *Coleman* for the proposition that § 7 requires consideration of the "total impact" of a proposed project.  This term is found nowhere in the statute or governing regulations.  Read in context, it is clear that this court's admonition in *Coleman* that "[t]he relevant consideration is the total impact of the highway on the crane" meant simply that the agency should have considered the indirect effects of the highway.  529 F.2d at 373.

No. 09-60108

MCEAA also contends that the respondents' analysis of the effects and cumulative effects of the proposed rail and Phase One on listed species and karst formations was so inadequate as to render the Decision arbitrary and capricious.[21]

MCEAA first complains that the portions of the EIS that considered the environmental effects of noise and vibration from the construction and operation of the rail line, and the cumulative impact of noise and vibration from the quarry, were conclusory in nature and did not specifically assess what effect these would have on listed species. MCEAA also argues that the EIS should have assessed the effect that lighting from the quarry's projected round-the-clock operation would have on listed species.[22] The respondents counter that the analysis was thorough and that the absence of analysis specific to listed species does not render the Decision arbitrary and capricious. We agree. The noise and vibration analysis, far from being conclusory, is detailed and methodical, projecting decibel and vibration levels for each of the proposed actions, assessing which residences and other structures would be affected, and proposing extensive mitigation measures. As for the absence of analysis specific to listed species, all of the survey evidence available to the STB and FWS showed that no listed species were present in the areas where the noise and vibrations were to

_____

[21] MCEAA also complains that these analyses were not performed on the remainder of the 1,760-acre tract, but we have already concluded that the STB and FWS were not required to analyze that portion of the tract in granting the exemption.

[22] MCEAA also argues that the EIS failed to consider the effects that land clearing in the proposed rail and Phase One areas would have on listed species. This is false. The EIS documents noted the portions of the proposed rail and Phase One area that contained suitable habitat for warblers and considered how much of that habitat would be displaced by the proposed actions at the site.

28

occur—rendering analysis of effects of noise, vibration, and light on those species superfluous, if not impossible. Furthermore, the STB found, and MCEAA does not dispute, that whatever adverse noise and vibration effects the proposed rail posed, the effects from the no-action alternative would be worse. Even if the STB could have done more analysis—and the record does not show that more was required—MCEAA has not shown that the noise and vibration analysis rendered the Decision arbitrary and capricious. *See Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1448 (9th Cir. 1996) (deferring to agency judgment despite "gaps and imperfections" in the administrative record).

MCEAA also argues that the STB's analysis of the proposed action's effects on listed karst invertebrates was inadequate. According to MCEAA, despite the fact that karst features were identified on the quarry property, these features were not surveyed, and the STB has "conclude[d] without any analysis that Vulcan's proposed mitigation will be sufficient." Neither of these criticisms is supported by the record. As MCEAA has acknowledged in other parts of its briefing, Vulcan produced detailed surveys and maps of the karst features on the entire tract as part of its WPAP. The STB found, after conducting a biological analysis of the proposed rail line and Phase One area, that the mitigation measures required by the TCEQ as a condition of approval of the WPAP would adequately address any danger that these activities might pose to groundwater and karst features, or to the listed karst invertebrates that rely on them. In addition, one mandatory condition of the Decision was that SGR consult with a "karst feature specialist" and "implement appropriate mitigation measures" if it discovered any additional karst features during rail construction. MCEAA's

critique of the STB's analysis of the effects on karst invertebrates lacks support in the record and does not show that the Decision was arbitrary and capricious.

Finally, MCEAA argues that the STB and FWS improperly premised their approvals of the proposed action on two mitigation measures that MCEAA contends are "unenforceable" and insufficient to mitigate the effects of the proposed action. The first such measure is Vulcan's commitment to maintaining a 200-foot-wide vegetated buffer along the perimeter of the site. The second is Vulcan's commitment to clear land only outside the golden-cheeked warblers' breeding season. MCEAA's criticisms of these measures lack merit. The 200-foot-wide vegetated buffer is mandatory and enforceable as part of its commitments to the TCEQ under the WPAP. And although Vulcan's commitment only to clear land outside the warblers' breeding season is part of Vulcan's voluntary program of cooperation with the FWS to avoid violating § 9, the possible penalties and threat of citizen suits give Vulcan every incentive to adhere to this commitment. The STB's and FWS's conclusions that these mitigating measures would provide meaningful protection to listed species are the type of technical determinations to which we accord particular deference. *See Marsh*, 490 U.S. at 376–77. MCEAA has not shown that the respondents' reliance on these mitigation measures in support of their conclusions as to jeopardy rendered the Decision arbitrary and capricious.

## C.    The Motion to Supplement

MCEAA has moved to supplement the administrative record with two documents that contain information that MCEAA contends the agencies should

No. 09-60108

have considered before reaching their determinations.[23] MCEAA argues that by failing to consider the type of information contained in these documents, the agencies failed to consider the "best scientific and commercial data" in rendering their decision, as § 7 of the ESA requires. *See* 16 U.S.C. § 1536(a)(2). The documents at issue discuss the impacts of surrounding private developments on the population of golden-cheeked warblers at the United States Army's Camp Bullis Military Reservation in Bexar County, which is located approximately thirty-five miles from the proposed quarry. The first document is a 2005 Final Programmatic Biological Opinion that was prepared by the FWS regarding the § 7 implications of Camp Bullis's Military Mission and Associated Land Management Practices and Endangered Species Management Plan. The document notes that one of the "surrounding pressures" on warblers was "development around Camp Bullis that result[ed] in destruction of habitat and a reduction in the amount of available habitat." The second document is a series of Field Season Reports that the Army submitted to the FWS between 2000 and 2008. These reports contain the results of surveys performed of Camp Bullis's warbler population and show an increase in the population of singing male warblers during those years.

When reviewing an agency action under the APA, we review "the whole record or those parts of it cited by a party." 5 U.S.C. § 706. The record consists of the order involved, any findings or reports on which that order is based, and

---

[23] MCEAA also attached two additional documents to its motion to supplement—a November 13, 2008, PowerPoint presentation compiled by the Department of the Army and a May 15, 2009, email from a Department of the Army Officer to MCEAA. Nowhere in MCEAA's briefing does it describe these documents or state whether (and if so, why) these documents should supplement the record. We therefore do not consider these documents.

31

"the pleadings, evidence, and other parts of the proceedings before the agency." FED. R. APP. P. 16(a). Supplementation of the administrative record is not allowed unless the moving party demonstrates "unusual circumstances justifying a departure" from the general presumption that review is limited to the record compiled by the agency. *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008). Supplementation may be permitted when:

> (1) the agency deliberately or negligently excluded documents that may have been adverse to its decision, . . .
>
> (2) the district court needed to supplement the record with "background information" in order to determine whether the agency considered all of the relevant factors, or
>
> (3) the agency failed to explain administrative action so as to frustrate judicial review.

*Id.* (internal quotation marks and citations omitted). MCEAA contends that supplementation is appropriate in this case because the FWS deliberately or negligently failed to consider the findings in its own 2005 Biological Opinion and the survey documents it received as to the effects of development on warbler habitat before concurring with the STB's findings in the Final EIS. The STB and FWS oppose supplementation, arguing that this is not the type of extraordinary circumstance that merits supplementation and that there is no reason why they should have considered these documents.

The information that MCEAA urges from the proffered documents can be reduced to a simple proposition: When the golden-cheeked warbler's habitat is marginalized or destroyed by what MCEAA refers to as the "edge effects" of development—for example, land clearing, noise, lighting, and vibration—the warbler will move, if possible, to an area where the habitat is better. All of the survey evidence available to the STB and FWS, however, showed that there were

## No. 09-60108

no listed species in the proposed rail and Phase One area—rendering any analysis of whether the rail line and quarry activities would drive them out of that area superfluous. Furthermore, the EIS documents discussed the quality and extent of potential habitat in the proposed rail and Phase One areas and gave extensive consideration to how construction and operations could proceed while best preserving the small amount of "low quality" habitat present in the Phase One area. The documents with which MCEAA proposes to supplement the administrative record do not contain information potentially adverse to the Decision and do not set out additional factors that the STB and FWS failed to consider. Accordingly, we deny the motion to supplement the administrative record.[24]

MCEAA's petition also attached an affidavit by John Kennerly, a landowner to the north of the 1,760-acre tract, dated January 12, 2009. This affidavit was not part of the administrative record and MCEAA has not moved to supplement the administrative record with this document. Accordingly, we do not consider Kennerly's affidavit in the disposition of this case.

### IV.  Conclusion

For the foregoing reasons, MCEAA's petition for review of the Decision and motion to supplement are DENIED.

---

[24] MCEAA also casts its motion to supplement as a motion to direct the FWS to "complete" the administrative record with these documents, which were in the FWS's possession but not in connection with this case. Because we conclude that these documents do not contain information potentially adverse to the Decision or set out additional factors that the STB and FWS failed to consider, we deny the motion and need not address whether the FWS could otherwise be compelled to add the documents at issue to the administrative record.